**Martin R. SHUGRUE, Jr., Trustee, Plaintiff,**

v.

**CONTINENTAL AIRLINES, INC., et al., Defendants.**

**CONTINENTAL AIRLINES, INC., and System One Information Management Corp., Counterclaim Plaintiffs,**

v.

**Martin R. SHUGRUE, Jr., Trustee, Counterclaim Defendant,**

and

**John J. Sicilian, Liquidating Agent, and EAL Newco, Inc., Additional Counterclaim Defendants.**

No. 94 Civ. 8672 (DC).

United States District Court, S.D. New York.

Sept. 15, 1997.

Holland & Knight by James E. Akers, Washington, DC and by Judith M. Korchin, Craig V. Rasile, Miami, FL, and DeOrchis & Partners by Nicholas Pantelopoulos, New York City, for Plaintiff.

Cravath, Swaine & Moore by David Boies, New York City and Boies & McInnis by Mary Boies, Norman K. McInnis, Bedford, NY, for Defendants.

## OPINION

CHIN, District Judge.

Eastern Airlines, Inc. ("Eastern"), by its trustee, Martin R. Shugrue, Jr., brings this action seeking a declaratory judgment that it is the owner and holder of rights in certain computer software used in the airline industry. Defendants Continental Airlines, Inc. ("Continental") and System One Information Management Corporation ("System One") maintain that Eastern has no rights in the software, and they have filed counterclaims against Eastern and the additional counterclaim defendants for damages.

Before the Court are four motions: (1) Eastern's motion to substitute Amadeus SA for Continental and System One; (2) Eastern's motion to disqualify counsel for Continental and System One; (3) defendants' motion for summary judgment dismissing the complaint; and (4) Eastern's motion to dismiss or, alternatively, for summary judgment dismissing the counterclaims.

For the reasons that follow, defendants' motion for summary judgment is granted and the complaint is dismissed. Likewise, plaintiff's motion to dismiss is granted and the counterclaims are dismissed. Accordingly, I do not reach the substitution or disqualification motions.

## BACKGROUND

### A. Facts

#### 1. The Agreements

On July 1, 1986, Eastern established two wholly-owned subsidiaries—System One Direct Access, Inc. ("SODA") and EAL Automation Systems, Inc. ("EASi")—and transferred certain computer operations to them. Eastern executed a number of documents in connection with these transactions, including the July 1, 1986 Stock Subscription Agreement with EASi (the "EASi Stock Agreement"). One issue in dispute in this case is whether, as part of the EASi Stock Agreement, Eastern transferred the copyrights to its computerized reservations system software (the "CRS software") to EASi.

On March 15, 1987, Eastern sold all of the stock in SODA and EASi to System One Corporation ("SOC"), a subsidiary of Texas Air, for $100 million. (Def. Statement of Facts ¶ 3.1; Pl. Counterstatement of Facts ¶ 49).[1] Hence, whatever rights EASi had in the CRS software were acquired by SOC. SOC later merged with other companies to become System One, a defendant in this case.

From March 15, 1987 forward, SOC (and later System One) held itself out to the airline industry and the public as the owner of the CRS software. Indeed, after March 15, 1997 Eastern paid fees to System One for use of the CRS software.

On April 10, 1987, EASi, then owned by System One, entered into a Service Agreement (the "EASi Service Agreement") with Eastern by which System One agreed to provide computer services to Eastern using the CRS software and certain other software used for airline and business operations. This agreement is the source of the debate as to who retained licensing rights in the software. Section 10.03 of the EASi Service Agreement provides in pertinent part:

> Upon termination of any Services provided under this Agreement resulting from a Default by EASi or from expiration of this

---

1. Texas Air apparently acquired Eastern in November 1986. (Pl. 3(g) Counterstatement ¶ 48). As a result, Eastern, Continental, and System One were all subsidiaries of Texas Air at one point. Continental became Texas Air's successor sometime after 1990. In addition, System One changed its name to Continental CRS Interests Inc. on April 27, 1995.

Agreement, EASi will furnish Eastern, at Eastern's cost, duplicates of all programs and software and originals or copies of all magnetic tapes, print-outs, data base and other information used in connection with the service or services being terminated. In addition, upon a termination of this Agreement resulting from a Default by EASi or upon expiration of this Agreement, EASi shall at no additional charge grant to Eastern a perpetual, nonexclusive, nontransferable license to use and to allow other parties to use for its benefit all such programs and software, magnetic tapes, print-outs, data base and other information. . . .

The EASi Service Agreement provided that it was to expire on December 31, 1999.[2]

Eastern contends that the EASi Service Agreement terminated as the result of several events in 1990 and 1991 and that, pursuant to section 10.03, it therefore acquired a license to use—and to allow other parties to use—the software, including the CRS software, that had been used to provide services under the agreement. Defendants argue that the EASi Service Agreement did not terminate in the manner required by section 10.03 and that, even if it did, the license was limited to use by Eastern for its own airlines operations.

Hence, Eastern claims rights to the CRS software in two respects: first, it contends that it retained ownership of the copyrights to the CRS software when it transferred its computer operations to EASi in 1986 under the EASI Stock Agreement, and second, it contends, alternatively, that it acquired a license to the CRS software when the EASi Service Agreement was terminated.

### 2. The Bankruptcy Proceedings

On March 9, 1989, Eastern filed for bankruptcy and was required to list all of its assets. The Bankruptcy Court appointed an Examiner to investigate certain intercorporate transactions between Eastern and its affiliates, including the sale by Eastern of SODA and EASi to System One.

In February 1990, the Bankruptcy Court terminated Continental's control over its former subsidiary, Eastern. In April 1990, the Bankruptcy Court appointed Martin R. Shugrue, Jr. as Eastern's Trustee. Continental and System One filed for bankruptcy in December 1990. On January 19, 1991, Eastern ceased all flight operations.

On July 2, 1992, Eastern and System One, together with Texas Air and Continental, entered into a settlement referred to as the "Global Settlement." In October 1992, this settlement was approved by the Bankruptcy Court in the Southern District of New York presiding over Eastern's bankruptcy proceedings as well as by the Bankruptcy Court in Delaware presiding over System One's and Continental's bankruptcy proceedings. In the settlement, the parties expressly released all claims among them relating to certain intercorporate transactions. Eastern's claim to copyrights to the CRS software apparently were not explicitly discussed during these negotiations.

On April 16, 1993, the Bankruptcy Court in Delaware confirmed the Continental and System One Plan of Reorganization. By its terms, this Plan extinguished all claims against Continental and System One.

In 1993 and 1994, Eastern purportedly began to try to market the CRS software to customers of System One. When Eastern filed its proposed Plan of Reorganization in Bankruptcy Court in September 1994, Eastern asserted a copyright interest in the CRS software. Continental, System One, and EDS filed objections to the assertion by Eastern of rights in the software.

### 3. The Assignment to Amadeus SA

On April 27, 1995, System One entered into a series of transactions with Amadeus SA ("Amadeus"), a joint venture of European airlines, by which it sold most of its assets—

---

2. At some point, System One became unable to provide the services required under the EASi Service Agreement. As a result, in 1990 System One assigned the EASi Service Agreement to defendant Electronic Data Systems ("EDS").

Eastern and EDS have settled the claims between them. Pursuant to the settlement, EDS remains a nominal party to this litigation only with respect to Eastern's claims for declaratory or other equitable relief.

including the CRS software—to entities affiliated with Amadeus.

## B. *Procedural History*

On October 25, 1994, Continental and System One commenced an adversary proceeding in the Bankruptcy Court in Delaware to determine whether prior orders of that court entered in connection with the Continental bankruptcy were dispositive of Eastern's claims. On the same day, Eastern filed a complaint with the Bankruptcy Court in the Southern District of New York seeking a declaratory judgment that it had rights in the CRS and ADS software. The case came to this Court on a motion to withdraw the reference by EDS on December 1, 1994.

In September 1995, Continental and System One filed counterclaims based on Eastern's assertions that it had licensing and copyrights in the CRS software. Continental and System One argue that these assertions damaged System One's reputation and goodwill for stability and certainty by calling into question its ownership of the CRS software.

These motions followed.

## *DISCUSSION*

## I. *Defendants' Motion for Summary Judgment*

Continental and System One seek summary judgment dismissing both the copyright and the license claims. Their motion is granted, for the documentary evidence and indisputable facts show that Continental and System One are entitled to judgment dismissing both claims as a matter of law.

Continental and System One move for summary judgment on a number of grounds. I will discuss only those grounds as to which I believe summary judgment is appropriate.

First, with respect to the copyright claim, the plain language of the EASi Stock Agreement shows unambiguously that Eastern conveyed "all right, title and interest" in all its software, including the CRS software, to EASi. Second, with respect to the licensing claims, no reasonable factfinder could conclude that the Service Agreement was terminated in such a manner as to trigger a

transfer of a license under section 10.03. Third, both the copyright and licensing claims are barred by the Global Settlement.

## A. *The EASi Stock Agreement*

Continental and System One argue that the EASi Stock Agreement is a fully integrated contract that unambiguously transferred any interest Eastern held in the CRS software, including the copyrights, to EASi. I agree.

Section II(D) of the EASi Stock Agreement, which is labelled "Software," provides in its entirety as follows:

> EAL [Eastern] hereby transfers and conveys to the Corporation [EASi] *all right, title and interest* of [Eastern] in and to *all programs and software* listed and described on the Schedule of Software attached hereto as *Schedule C* (the "Software").

(Emphasis added). Three versions of Schedule C have been submitted to the Court: a 49–page version offered by Continental and System One, which refers to the CRS software; a two page-version, the second page of which simply states "attached list" omitted; and a three-page version offered by Eastern, which contains an apparent excerpt of a list that does not refer to the CRS software. All three versions, however, have the same first page, which contains the following language:

> *All* of Eastern Air Lines, Inc.'s computer programs and software, *including without limitation* the programs and software with which the user may use the functions set forth on the attached list.

(Emphasis added).

Two issues are presented by these provisions: First, whether Eastern's transfer to EASi of "all right, title and interest" to the programs and software in question resulted in a transfer of just a license to use the programs and software, with Eastern retaining the copyrights, or whether the copyrights were transferred as well; and second, whether, even assuming copyrights also were being transferred, the CRS software was included among the programs and software being transferred.

Under the Copyright Act of 1976 (the "Act"), ownership of a copyright is "distinct from ownership of any material object in which the work is embodied," and "[t]ransfer of ownership of any material object ... does not of itself convey any rights in the copyrighted work embodied in the object." 17 U.S.C. § 202. Hence, if the language of transfer is ambiguous, the contract will be read to transfer only the material object, not ownership of the copyright itself.

■ While the Act does not require the use of the word "copyright" in a contract to render the contract unambiguous in this respect, *see Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir.1992) (although agreement transferring assets did not use the word "copyright," its "wording" left little doubt that all assets, "tangible and intangible alike," including copyrights, were sold), in some instances courts have interpreted the absence of that word to create an issue of intent. In *Playboy Enterprises, Inc. v. Dumas*, 831 F.Supp. 295 (S.D.N.Y.1993), *aff'd in relevant part and rev'd in other respects*, 53 F.3d 549 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995), a case involving the transfer of paintings, the Court held that the phrase "all right, title and interest" appearing in a legend stamped on the back of checks used to pay for the paintings was not sufficient, by itself, to transfer the copyrights to the paintings. The Court wrote that "unless there is evidence of an intention to transfer copyright, a writing merely reciting transfer of an object will not transfer the copyright." *Id.* at 309; *see also Kenbrooke Fabrics Inc. v. Soho Fashions Inc.*, 13 U.S.P.Q.2d 1472, 1476, 1989 WL 117704 (S.D.N.Y.1989).

In the context of software, at least one court has held that language similar to "all right, title and interest" was sufficient to transfer the copyright, *see Relational Design & Technology, Inc. v. Brock*, No. 91–2452–EEO, 1993 WL 191323, at *6 (D.Kan. May 25, 1993) (transfer of "all rights to the completed program with no licensing or royalties fees due" included copyright); *cf. S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir.1989) (holding that in "the context of the parties' entire agreement," the phrase "all rights of ownership" "plainly encompasses not only copyright ownership, but also ownership of any copies of the software"), while at least one other court has held it does not. *See Friedman v. Stacey Data Processing Servs., Inc.*, No. 89 C 4444, 1990 WL 172586, at *5 (N.D.Ill. Nov.1, 1990) (contract stating that plaintiff owned software programs "in their entirety" not sufficiently clear to include copyrights in software).

■ In the instant case, however, there is no ambiguity. The only reasonable interpretation of the pertinent language of the EASi Stock Agreement is that the parties intended the transfer of *all* rights, including copyrights, to *all* of Eastern's programs and software, including the CRS software.

The language of the EASi Stock Agreement is clear and unambiguous. Eastern transferred "all right, title and interest" to "[a]ll of [its] computer programs and software." No exception was carved out for copyrights; no rights, titles or interests were retained; and the transfer was not just of a "license." Indeed, another provision of the Agreement provides:

> [EASi] and [Eastern] agree that title and ownership of the Software is being transferred to [EASi] and that the software is agreed to be [EASi]'s proprietary information and trade secret, regardless of whether any portion thereof is or may be validly copyrighted or patented.

This language confirms that the parties intended for the intellectual property rights to be transferred to EASi.

Similarly, the language of the first page of Schedule C is clear and unambiguous. It includes on the list of software being transferred "[a]ll" of Eastern's computer programs and software. Even assuming there is some ambiguity as to what was actually attached to the first page of Schedule C, the language on that first page—"[a]ll of Eastern[ ]'s computer programs and software, including without limitation"—makes it clear that the attached list was not an exclusive list. Hence, even assuming the CRS software was not listed in the attached list, un-

der the plain language of Section C, it was still included in the transfer.

Eastern's proposed interpretation of the EASi Stock Agreement would require that section II(D) be rewritten to include language to the effect that Eastern was transferring only a license or that Eastern was retaining the copyrights. No such language exists.

Eastern's proposed interpretation simply does not make sense. Computer programs and software are not like paintings or other tangible objects. In a non-consumer setting such as this, a transfer of "all right, title and interest" to computer programs and software can only mean the transfer of the copyrights as well as the actual computer program or disks. If the parties to such a transaction intend to transfer just a license to use the program, with the transferor retaining the copyrights, the parties surely would spell that out.

 Eastern seeks to generate ambiguity by pointing to extrinsic evidence, including other agreements executed when the EASi Stock Agreement was executed. This evidence is not properly considered, however, for under the parol evidence rule, "if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself 'rather than from extrinsic evidence.'" *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 987–88 (2d Cir.1991) (citation omitted). Here, the EASi Stock Agreement is unambiguous on its face and lends itself to only one reasonable interpretation. Moreover, the EASi Stock Agreement contains a merger clause (section X), which provides that "[t]his Agreement (including the Schedules) represents the entire agreement between the parties as to the subject matter it covers." Hence, Eastern may not substitute extrinsic evidence for the plain language of the contract. *See Meinrath v. Singer Co.*, 482 F.Supp. 457, 461 (S.D.N.Y.1979) (Weinfeld, J.), *aff'd mem.*, 697 F.2d 293 (2d Cir.1982).

Even if one considers the extrinsic evidence proffered by Eastern, no ambiguity can be found. For example, Eastern relies on the SODA Stock Subscription Agreement, by which Eastern granted a license to use its software to SODA and explicitly retained "all right, title and interest" therein. Eastern argues that these provisions were inconsistent with an intent to transfer the copyrights to EASi. I disagree. The EASi Stock Agreement provided that the transfer of software was "subject to all licenses granted." Hence, EASi took its rights subject to existing licenses, including the licenses granted to SODA. Moreover, the SODA agreement demonstrates unequivocally that when Eastern wanted to transfer only a license and when it wanted to retain rights to software, it knew how to do so.

Another example of the extrinsic evidence relied on by Eastern are the drafts of documents proposed in earlier transactions with other parties that were not consummated. These drafts apparently expressly provided for the retention of rights by Eastern. Eastern argues that these documents show that it intended to retain the copyrights. Eastern's intent on prior, unrelated, unconsummated transactions sheds little light on its intent in entering the EASi Stock Agreement. To the contrary, if anything, these drafts again confirm that when Eastern wanted to retain rights, it knew how to do so.[3]

The plain language of the EASi Stock Agreement requires that summary judgment

---

**3.** If one were to look at the extrinsic evidence, *see, e.g.*, *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir.1965) ("Where ambiguity is present in a contract, the subsequent conduct of the parties may be used to indicate their intent.") (citations omitted); *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279, 281–82 (S.D.N.Y.1977) (same), one would find extensive course of conduct evidence confirming that Eastern did not believe it was retaining the copyrights. Continental and System One point to evidence such as: (1) Eastern's failure to suggest either to its appraisers or its lenders for the sale of SODA and EASi that it retained copyrights to the CRS software; (2) the absence of any reference in the minutes of the Eastern Board or Executive Committee meetings to the retention of copyrights by Eastern; (3) the absence of any reference in the documents prepared in 1987 for the SODA and EASi sale indicating that Eastern transferred the copyright; and (4) Eastern's payment to System One of fees for the use of the CRS software.

be granted in favor of defendants dismissing the copyright claim.

## B. *The Service Agreement*

Eastern's licensing claim is based on § 10.03 of the EASi Service Agreement, which grants Eastern a license to the software used in implementing the contract, including the CRS software, "upon a termination of this Agreement resulting from a Default by EASi or upon expiration of this Agreement." Because the EASi Service Agreement does not expire until December 31, 1999, Eastern was granted a license only if the EASi Service Agreement terminated as a result of a default by EASi.

Eastern contends that the EASi Service Agreement terminated in three ways: (1) when System One "default[ed]" by filing for bankruptcy on December 3, 1990 (citing § 10.01(d) of the EASi Service Agreement); (2) when Eastern stopped flying on January 19, 1991; and (3) when Eastern terminated certain computer services after ending its flight operations. (Pl. Mem. at 39–40).[4] These contentions, however, must be rejected as a matter of law.

■ First, Section 10.03 provides for a transfer of a license upon a termination of the EASi Service Agreement *"resulting* from a Default by EASi." (Emphasis added). Hence, the termination had to be (1) caused (2) by a default by EASi. Even assuming System One's bankruptcy filing constituted a "default" on the part of EASi, that default did not trigger a transfer under section 10.03 because the bankruptcy filing did not cause the termination of any services under · the Agreement or the Agreement itself. To the contrary, Eastern concedes that it "stopped flying on January 19, 1991 and did not need to utilize the CRS software after that." (Pl. Mem. at 33). In fact, after that point, Eastern continued to use only a few computer services, such as accounting and payroll, covered by the EASi Service Agreement. Eastern does not, and cannot, contend that the EASi Service Agreement terminated as a

result of System One's bankruptcy filing on December 3, 1990.

Second, the remaining two purportedly "triggering" events relied on by Eastern likewise are not based on any "default" by EASi. Rather, they are based on Eastern's cessation of flight operations, and as EASi did not cause Eastern to stop flying, even assuming that the cessation of flight operations terminated the EASi Service Agreement, that termination did not result from any default on the part of EASi.

■ Third, by the same token, section 10.03 only grants a license to "all *such* programs and software," referring to programs and software used in connection with "services being terminated" as a result of a default by EASi or expiration of the Agreement. Hence, putting aside the issue of the expiration of the Agreement, a license was only being given for software used for services that .were terminated because of a default by EASi. As Eastern concedes, the CRS services were terminated by Eastern, when Eastern stopped flying; hence, the CRS services were not terminated as the result of any default on the part of EASi. (*See also* Ex. 25 to Def. Counterclaims) (letter from Eastern to System One on January 24, 1991 terminating certain computer services, including reservations).

■ Fourth, Eastern's argument that its cessation of flight operations on January 19, 1991 constituted an "early expiration" terminating the EASi Service Agreement is untenable. The phrase "upon expiration of this Agreement" cannot reasonably be read as encompassing a unilateral decision by Eastern to terminate the Agreement, for example, by stopping flights, before the end of its term. Such an interpretation would result in Eastern having the ability to unilaterally rewrite the contract by shortening, without EASi's consent, its term in violation of section 3.01 ("This Agreement shall ·... continue in full force and effect through December 31, 1999."). That cannot be the case.

---

**4.** "Pl. Mem." refers to Eastern's memorandum in opposition to defendants' summary judgment motion.

Finally, the EASi Service Agreement was an agreement for services, and section 10.03 was plainly designed to provide Eastern with continuity in services, not with a license to commercially exploit software. Hence, if services were terminated as the result of a default by EASi or expiration of the Agreement, Eastern was entitled to receive duplicates of programs and software "used in connection with the service or services being terminated." If the Agreement terminated as a result of any default by EASi or if it expired, EASi was to grant to Eastern "a perpetual, nonexclusive, *nontransferable* license to use and to allow other parties to use *for its benefit* all such programs and software...." (Emphasis added). By this language the parties clearly intended to grant Eastern only a license to continue to use, for its own benefit, the software that EASi had been using to provide services, in the event EASi caused the termination or the Agreement expired by its terms. The intent was not to grant a license to commercially exploit the CRS software in competition with EASi.

Eastern's interpretations of the EASi Service Agreement do not make sense and would require that its provisions be re-written. Those provisions, however, are clear and unambiguous and they simply cannot be interpreted in the manner suggested.

■ Eastern argues that even if no termination occurred and no license rights arose, the EASI Service Agreement was assigned to EDS, and "EDS' subsequent, repeated acknowledgement of Eastern's license rights and contractual delivery of the software must be viewed as an amendment of the agreement to eliminate the termination requirement...." (Pl. Mem. at 39 n. 32). This argument fails, however, because the EASi Service Agreement (§ 13.04) provided that it could be amended "only by an instrument in writing subsequently executed on behalf of each of the parties by their authorized representatives." No such instrument was ever executed. Rather, the correspondence relied on by Eastern cannot reasonably be construed as constituting an amendment of the Agreement.

Hence, the plain language of the EASi Service Agreement and the indisputable facts show that section 10.03 was not triggered in such a manner as to grant Eastern a license in the CRS software.

### C. *The Global Settlement*

■ Even assuming the relevant provisions of the EASi Stock Agreement and the EASi Service Agreement are ambiguous, and even assuming issues of fact exist as to their meaning, summary judgment still would be appropriate because of the terms of the July 2, 1992 Global Settlement.

The Global Settlement was entered into because the parties thereto—including Eastern, Continental, and System One—wanted "to resolve all claims and *potential* claims among themselves, except as expressly provided [t]herein." (Global Settlement, p. 7) (emphasis added). In particular, the Eastern Examiner had investigated approximately 15 transactions involving Eastern and Continental and Continental's affiliates; these were referred to as the "Intercorporate Transactions" and specifically included the March 1987 sale of SODA and EASi to System One. (*See* Pl. Mem. at 20).

In the Global Settlement, Eastern agreed to:

> release and discharge all persons and entities from any and all claims, demands and causes of action of any kind, both known and unknown, that they ever had, have or may now or in the future have against such person or entity arising out of or relating to the Intercorporate Transactions.

(Global Settlement § 10(a)). Eastern also agreed to:

> release and discharge the Continental Debtors, and any person to whom the Continental Debtors have transferred or may transfer assets involved in or related to any Intercorporate Transaction (but only with respect to such transfers of assets), from any and all claims, demands and causes of action of any kind, both known and unknown, that they ever had, have or may now or in the future have against them which arose prior to the date of this Settlement Agreement....

(*Id.* § 10(d)).

This language clearly encompasses Eastern's copyright claim, for that claim is based

on the argument that the sale of SODA and EASi—an "Intercorporate Transaction"—did not include a transfer of the copyrights. Moreover, there can be no dispute that from March 15, 1987 forward, System One held itself out to the airline industry and the public as the owner of the CRS software. Hence, when the parties entered into the Global Settlement in 1992, Eastern's claim to the copyrights to the CRS software was a claim that could have been asserted, "arising out of or relating to" an Intercorporate Transaction. It is irrelevant whether the parties explicitly discussed this claim when the Global Settlement was being negotiated, for all claims, "both known and unknown," were released.

Likewise, the Global Settlement bars Eastern from proceeding on its licensing claim. The Global Settlement specifically provides that Eastern "agrees that System One shall not have any obligation or liabilities to the Eastern Estate ... for the [EASi] Service Agreement...." (Global Settlement § 16, at 30). Hence, to the extent that Eastern had a claim that EASi was required to grant it a license under the EASi Service Agreement, that claim was released by the Global Settlement.

## II. *Eastern's Motion to Dismiss or for Summary Judgment*

In their counterclaims, Continental and System One have asserted state law tort causes of action for fraud, tortious interference with pre-contractual relations, and trade libel and damage to business reputation stemming from Eastern's claim of a proprietary interest in the CRS software.

In its motion to dismiss or in the alternative for summary judgment, Eastern raises two arguments: (1) that Continental and System One do not have standing, because of the assignment of the CRS software to Amadeus, to raise those arguments and (2) that this Court does not have subject matter jurisdiction over those claims. The standing argument is rejected, for Continental and System One have standing to seek damages

at least for the period prior to the assignment. I turn to the jurisdictional argument.

Continental and System One contend that this Court has subject matter jurisdiction over the counterclaims pursuant to 28 U.S.C. § 1334, which gives the district courts "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11," or 28 U.S.C. § 1367, which permits district courts to exercise supplemental jurisdiction over claims related to claims over which they have original jurisdiction.

In arguing that the Court has jurisdiction under section 1334, Continental and System One contend that the counterclaims seek to enforce and prevent nullification of bankruptcy court orders issued under Title 11. I disagree. The counterclaims are affirmative claims seeking damages and injunctive relief for common law torts. These claims are independent from the bankruptcy proceedings. At most, the bankruptcy proceedings constitute background. Hence, section 1334 is not an appropriate basis for the exercise of subject matter jurisdiction.

As to section 1367, while I agree that I have the ability to exercise supplemental jurisdiction over the counterclaims, I elect not to do so, as I have now granted summary judgment in favor of defendants dismissing the complaint. The purpose behind exercising supplemental jurisdiction—to resolve all related claims in one action—no longer exists. Accordingly, Eastern's motion to dismiss the counterclaims for lack of subject matter jurisdiction is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaint is granted, as is plaintiff's motion to dismiss the counterclaims. In view of these rulings, I do not reach Eastern's motion to substitute Amadeus for Continental and System One or Eastern's motion to disqualify defendants' counsel.[5]

---

5. I note, in any event, that Eastern chose to wait until 18 months after the case was filed to raise the issue of counsel's disqualification.

The Clerk of the Court shall enter judgment dismissing the complaint with prejudice and dismissing the counterclaims without prejudice. Each side shall bear its own costs.

SO ORDERED.