The STATE of Tennessee ex rel. The ELVIS PRESLEY INTERNATIONAL MEMORIAL FOUNDATION, and The Elvis Presley International Memorial Foundation, Plaintiffs and Counter-Defendants/Appellants,

v.

Gentry CROWELL, Secretary of State, Defendant,

The Elvis Presley Memorial Foundation, Inc., Defendant/Appellee,

and

Elvis Presley Enterprises, Inc., Intervening Defendant and Counterclaimant/Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 3, 1987.

Peter M. Brown, Streibich & Brown, Memphis, for plaintiffs and counter-defendants/appellants.

C. Barry Ward, William R. Bradley, Jr., Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, for defendant/appellee.

## OPINION

KOCH, Judge.

This appeal involves a dispute between two not-for-profit corporations concerning their respective rights to use Elvis Presley's name as part of their corporate names. The case began when one corporation filed an unfair competition action in the Chancery Court for Davidson County to dissolve the other corporation and to prevent it from using Elvis Presley's name. Elvis Presley's estate intervened on behalf of the defendant corporation. It asserted that it had given the defendant corporation permission to use Elvis Presley's name and that it had not given similar permission to the plaintiff corporation.

The trial court determined that Elvis Presley's right to control his name and image descended to his estate at his death and that the Presley estate had the right to control the commercial exploitation of Elvis Presley's name and image. Thus, the trial court granted the defendant corporation's motion for summary judgment and dismissed the complaint.

The plaintiff corporation has appealed. Its primary assertion is that there is no descendible right of publicity in Tennessee

and that Elvis Presley's name and image entered into the public domain when he died. It also asserts that the trial court should not have granted a summary judgment because there are disputed factual issues and that the trial court should not have permitted the corporation representing Elvis Presley's estate to intervene. We concur with the trial court's determination that Elvis Presley's right of publicity is descendible under Tennessee law. However, for the reasons stated herein, we vacate the summary judgment and remand the case for further proceedings.

## I.

Elvis Presley's career is without parallel in the entertainment industry. From his first hit record in 1954 until his death in 1977, he scaled the heights of fame and success that only a few have attained. His twenty-three year career as a recording star, concert entertainer and motion picture idol brought him international recognition and a devoted following in all parts of the nation and the world.

Elvis Presley was aware of this recognition and sought to capitalize on it during his lifetime. He and his business advisors entered into agreements granting exclusive commercial licenses throughout the world to use his name and likeness in connection with the marketing and sale of numerous consumer items. As early as 1956, Elvis Presley's name and likeness could be found on bubble gum cards, clothing, jewelry and numerous other items. The sale of Elvis Presley memorabilia has been described as the greatest barrage of merchandise ever aimed at the teenage set.[1] It earned millions of dollars for Elvis Presley, his licensees and business associates.

Elvis Presley's death on August 16, 1977 did not decrease his popularity. If anything it preserved it. Now Elvis Presley is an entertainment legend, somewhat larger than life, whose memory is carefully preserved by his fans, the media and his estate.

The demand for Elvis Presley merchandise was likewise not diminished by his death. The older memorabilia are now collector's items. New consumer items have been authorized and are now being sold. Elvis Presley Enterprises, Inc., a corporation formed by the Presley estate, has licensed seventy-six products bearing his name and likeness and still controls numerous trademark registrations and copyrights. Graceland, Elvis Presley's home in Memphis, is now a museum that attracts approximately 500,000 paying visitors a year. Elvis Presley Enterprises, Inc. also sells the right to use portions of Elvis Presley's filmed or televised performances. These marketing activities presently bring in approximately fifty million dollars each year and provide the Presley estate with approximately $4.6 million in annual revenue. The commercial exploitation of Elvis Presley's name and likeness continues to be a profitable enterprise. It is against this backdrop that this dispute between these two corporations arose.

A group of Elvis Presley fans approached Shelby County officials sometime in 1979 concerning the formation of a group to support a new trauma center that was part of the Memphis and Shelby County hospital system. This group, calling themselves the Elvis Presley International Memorial Foundation, sought a charter as a Tennessee not-for-profit corporation in October, 1980. The Secretary of State denied their application on November 12, 1980 stating that "[t]he name Elvis Presley cannot be used in the charter."

Lawyers representing the group of fans and the Presley estate met to discuss the group's use of Elvis Presley's name following the Secretary of State's rejection of the charter application. In December, 1980, the Presley estate and its trademark counsel formally declined to give the group the unrestricted right to use Elvis Presley's name and likeness. However, the Presley estate offered the group a royalty-free license to use Elvis Presley's name and likeness if the group agreed to abide by eight conditions limiting the group's activities.

---

1. R. Cranor, *Elvis Collectibles* 4 (1983).

The group declined the offer of a royalty-free license.

The Presley estate incorporated Elvis Presley Enterprises, Inc. on February 24, 1981. Two days later on February 26, 1981, the Secretary of State, reversing its original decision, granted the fan group's renewed application and issued a corporate charter to the Elvis Presley International Memorial Foundation (International Foundation). The International Foundation raises funds by charging membership fees and dues and by sponsoring an annual banquet in Memphis. It uses its funds to support the trauma center of the new City of Memphis Hospital which was named after Elvis Presley and to provide an annual award of merit.

The Presley estate and Elvis Presley Enterprises, Inc. incorporated the Elvis Presley Memorial Foundation, Inc. (Foundation) as a Tennessee not-for-profit corporation on May 14, 1985. The Foundation is soliciting funds from the public to construct a fountain in the shopping center across the street from Elvis Presley's home.

The International Foundation's previously amicable relationship with the Presley estate and Elvis Presley Enterprises, Inc. deteriorated after the formation of the Foundation. On July 17, 1985, the International Foundation filed this action seeking to dissolve the Foundation and to enjoin it using a deceptively similar name.

## II.

### *The Intervention of Elvis Presley Enterprises, Inc.*

The International Foundation questions the trial court's decision permitting Elvis Presley Enterprises, Inc. to intervene as a defendant in this action. It argues that Elvis Presley Enterprises, Inc. should not have been permitted to intervene as of right because it failed to demonstrate that the existing parties were not adequately representing its interests. The trial court has the discretion to permit a party showing good cause to intervene. *Cummins v. Woody*, 177 Tenn. 636, 640, 152 S.W.2d 246, 247 (1941) and *Express*

*Companies v. Mann*, 3 Tenn.Civ.App. (Higgins) 6, 10 (1912). The trial court did not abuse its discretion in this case. Elvis Presley Enterprises, Inc.'s exclusive right to control the commercial exploitation of Elvis Presley's name and likeness is at the heart of this case. It traces this right to the Presley estate and to the residuary trust created in Elvis Presley's will. There is no indication in this record that the Elvis Presley International Memorial Foundation formally objected to Elvis Presley Enterprises, Inc.'s intervention. Thus, Elvis Presley Enterprises, Inc. should be permitted to protect its interests that were put at risk when this action was filed.

## III.

### *Elvis Presley's Right of Publicity*

We are dealing in this case with an individual's right to capitalize upon the commercial exploitation of his name and likeness and to prevent others from doing so without his consent. This right, now commonly referred to as the right of publicity, is still evolving and is only now beginning to step out of the shadow of its more well known cousin, the right of privacy.

The confusion between the right of privacy and the right of publicity has caused one court to characterize the state of the law as a "haystack in a hurricane." *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481, 485 (3d Cir.1956). This confusion will not retard our recognition of the right of publicity because Tennessee's common law tradition, far from being static, continues to grow and to accommodate the emerging needs of modern society. *Powell v. Hartford Accident & Indemnity Co.*, 217 Tenn. 503, 509–10, 398 S.W.2d 727, 730–31 (1966); *Box v. Lanier*, 112 Tenn. 393, 407, 79 S.W. 1042, 1045 (1904); and *Jacob v. State*, 22 Tenn. (3 Hum.) 493, 515 (1842). See also *O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir.1941) (Holmes, J., dissenting), *cert. denied*, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1220 (1942) and Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 195 (1890).

### A.

The right of privacy owes its origin to Samuel Warren's and Louis Brandeis' now famous 1890 law review article. Warren & Brandeis, *The Right to Privacy*, 4 Harv.L. Rev. 193 (1890). The authors were concerned with the media's intrusion into the affairs of private citizens and wrote this article to vindicate each individual's "right to be left alone." The privacy interest they sought to protect was far different from a celebrity's interest in controlling and exploiting the economic value of his name and likeness.

Writing in 1890, Warren and Brandeis could not have foreseen today's commercial exploitation of celebrities. They did not anticipate the changes that would be brought about by the growth of the advertising, motion picture, television and radio industries. American culture outgrew their concept of the right of privacy and soon began to push the common law to recognize and protect new and different rights and interests.

It would be difficult for any court today, especially one sitting in Music City U.S.A. practically in the shadow of the Grand Ole Opry, to be unaware of the manner in which celebrities exploit the public's recognition of their name and image. The stores selling Elvis Presley tee shirts, Hank Williams, Jr. bandannas or Barbara Mandrell satin jackets are not selling clothing as much as they are selling the celebrities themselves. We are asked to buy the shortening that makes Loretta Lynn's pie crusts flakier or to buy the same insurance that Tennessee Ernie Ford has or to eat the sausage that Jimmy Dean makes.

There are few every day activities that have not been touched by celebrity merchandising. This, of course, should come as no surprise. Celebrity endorsements are extremely valuable in the promotion of goods and services. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir.1983). They increase audience appeal and thus make the commodity or service more sellable. *Uhlaender v. Hendricksen*, 316 F.Supp. 1277, 1278 (D.Minn.1970). These endorsements are of great economic value to celebrities and are now economic reality.

The first decision to recognize the right of publicity as a right independent from the right of privacy was *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). The United States Court of Appeals for the Second Circuit stated:

> This right might be called a "right of publicity." For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their counterances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures. *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir.1953).

The concept of an independent right of publicity did not achieve immediate recognition. Dean Prosser, in his authoritative discussions of the right of privacy, continued to include the right of publicity as one of the four distinct interests protected by the right of privacy. W. Prosser, *Handbook of the Law of Torts* § 97, at 637 & 639 (2d ed. 1955). In his later writings, Prosser characterized the right of publicity as

> an exclusive right in the individual plaintiff to a species of trade name, his own, and a kind of trade mark in his likeness. It seems quite pointless to dispute over whether such a right is to be classified as "property;" it is at least clearly proprietary in nature. W. Prosser, *Handbook of the Law of Torts*, § 117, at 807 (4th ed. 1971).

See also W. Keeton, *Prosser and Keeton on the Law of Torts* § 117, at 854 (5th ed. 1984).

The Restatement (Second) of Torts adopted Prosser's analytic conception of the scope of the right of privacy. Restatement (Second) of Torts § 652A (1976) embodies his four right of privacy categories. However, the American Law Institute recognized that the nexus between the right of publicity and the other three categories is tenuous. Restatement (Second) of Torts § 652A(2) comm. b (1976). Based upon this difference, the Restatement (Second) of Torts § 652I (1976) recognizes that the right of publicity may be descendible even if the other categories are not.

The legal experts have consistently called for the recognition of the right of publicity as a separate and independent right.[2] In 1977, the United States Supreme Court recognized that the right of publicity was distinct from the right of privacy. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 571–74, 97 S.Ct. 2849, 2855–56, 53 L.Ed.2d 965 (1977). Now, courts in other jurisdictions uniformly hold that the right of publicity should be considered as a free standing right independent from the right of privacy. *Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663, 677–78 n. 26 (7th Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3545 (U.S. Jan. 27, 1987); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir.1983); *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 694 F.2d 674, 674–75 (11th Cir. 1983); *Estate of Elvis Presley v. Russen*, 513 F.Supp. 1339, 1353 (D.N.J.1981); *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697, 703 (1982); and *House v. Sports Films & Talents, Inc.*, 351 N.W.2d 684, 685 (Minn.App. 1984).

### B.

The status of Elvis Presley's right of publicity since his death has been the subject of four proceedings in the Federal courts. The conflicting decisions in these cases mirror the difficulty other courts have experienced in dealing with the right of publicity.[3]

The first case originated in Tennessee and involved the sale of pewter statuettes of Elvis Presley without the exclusive licensee's permission. The United States District Court recognized Elvis Presley's independent right of publicity and held that it had descended to the Presley estate under Tennessee law. *Memphis Development Foundation v. Factors, Etc. Inc.*, 441 F.Supp. 1323, 1330 (W.D.Tenn. 1977). The United States Court of Appeals for the Sixth Circuit reversed. Apparently without considering Tennessee law, the court held that Tennessee courts would find that the right of publicity would not survive a celebrity's death. *Memphis Development Foundation v. Factors, Etc., Inc.*, 616 F.2d 956, 958 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

The second and third cases originated in New York and were originally decided under New York law. On two successive days, Judge Charles H. Tenney recognized Elvis Presley's right of publicity and held that it descended at death like any other intangible property right. *Factors Etc. Inc. v. Creative Card Co.*, 444 F.Supp. 279, 284 (S.D.N.Y.1977) and *Factors Etc., Inc. v. Pro Arts, Inc.*, 444 F.Supp. 288, 290 (S.D.N.Y.1977). Pro Arts, Inc. appealed, and the United States Court of Appeals for the Second Circuit, applying New York law, agreed that Elvis Presley's right of publicity survived his death and remanded the case. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221 (2d Cir.1978), *cert.*

**2.** Halpern, *The Right of Publicity: Commercial Exploitation of the Associative Value of Personality*, 39 Vand.L.Rev. 1199, 1249 (1986); Kwall, *Is Independence Day Dawning for the Right of Publicity?*, 17 U.C.D.L.Rev. 191, 254 (1983); Hoffman, *The Right of Publicity—Heirs' Right, Advertisers' Windfall, or Courts' Nightmare*, 31 DePaul L.Rev. 1, 44 (1981); Gordon, *Right of Property in Name, Likeness, Personality and His-*

*tory*, 55 Nw.L.Rev. 553, 611 (1960); and Nimmer, *The Right of Publicity*, 19 Law & Contemp. Probs. 203, 216 (1954).

**3.** Halpern, *The Right of Publicity: Commercial Exploitation of the Associative Value of Personality*, 39 Vand.L.Rev. 1199, 1223–29 (1986).

*denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979).

The dispute between Factors, Etc., Inc. and Pro Arts, Inc. did not end. On remand, Judge Tenney permanently enjoined Pro Arts from making any commercial use of Elvis Presley's name and likeness. Pro Arts, Inc. again appealed to the United States Court of Appeals for the Second Circuit. This time Pro Arts insisted that the controversy was governed by Tennessee law and that the United States Court of Appeals for the Sixth Circuit's opinion in *Memphis Development Foundation v. Factors, Etc., Inc.* should control.

The United States Court of Appeals for the Second Circuit agreed that Tennessee law controlled the case. While it expressly disagreed with the Sixth Circuit's holding in *Memphis Development Foundation v. Factors, Etc., Inc.,* it concluded that it was required to accept the Sixth Circuit's decision as controlling authority. *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 282–83 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982).[4]

The fourth case originated in New Jersey and involved an Elvis Presley impersonator. Applying New Jersey law, the United States District Court recognized Elvis Presley's right of publicity and held that it would be descendible under New Jersey law. *Estate of Elvis Presley v. Russen,* 513 F.Supp. 1339, 1354–55 (D.N.J.1981).

The courts in each of these cases recognized the existence of Elvis Presley's right of publicity. All the courts, except one, also recognized that this right was descendible upon Elvis Presley's death. The reasoning employed by the United States Court of Appeals for the Sixth Circuit to deny the descendibility of Elvis Presley's right of publicity has not been widely followed. The United States Court of Appeals for the Second Circuit specifically disagreed with it. *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 282 (2d Cir.1981). It has also been consistently criticized in the legal literature.[5]

### C.

The appellate courts of this State have had little experience with the right of publicity. The Tennessee Supreme Court has never recognized it as part of our common law or has never undertaken to define its scope. However, the recognition of individual property rights is deeply embedded in our jurisprudence. These rights are recognized in Article I, Section 8 of the Tennessee Constitution and have been called "absolute" by the Tennessee Supreme Court. *Stratton Claimants v. Morris Claimants,* 89 Tenn. 497, 513–14, 15 S.W. 87, 90 (1891). This Court has noted that the right of property "has taken deep root in this country and there is now no substantial dissent from it." *Davis v. Mitchell,* 27 Tenn.App. 182, 234–35, 178 S.W.2d 889, 910 (1943).

The concept of the right of property is multi-faceted. It has been described as a bundle of rights or legally protected interests. These rights or interests include: (1) the right of possession, enjoyment and use; (2) the unrestricted right of disposition; and (3) the power of testimonial disposition. *Weiss v. Broadway National Bank,* 204 Tenn. 563, 571, 322 S.W.2d 427, 431 (1959); *Sanford-Day Iron Works v. Enterprise Foundry & Machine Co.,* 138 Tenn. 437,

**4.** The United States Court of Appeals for the Second Circuit continued to acquiesce in its decision after conflicting unreported decisions by Tennessee trial courts were brought to its attention. *Factors Etc., Inc. v. Pro Arts, Inc.,* 701 F.2d 11, 12 (2d Cir.1983).

**5.** Halpern, *The Right of Publicity: Commercial Exploitation of the Associative Value of Personality,* 39 Vand.L.Rev. 1199, 1225 (1986); McLane, *The Right of Publicity: Dispelling Survivability, Preemption and First Amendment Myths Threatening to Eviscerate a Recognized State Right,* 20 Cal.W.L.Rev. 415, 420–22 (1984); Kwall, *Is Independence Day Dawning for the Right of Publicity?,* 17 U.C.D.L.Rev. 191, 212–14 (1983); Hoffman, *The Right of Publicity-Heirs' Right, Advertisers' Windfall, or Courts' Nightmare?,* 31 DePaul L.Rev. 1, 37–38 (1981); Felcher & Rubin, *The Descendibility of the Right of Publicity: Is There Commercial Life After Death?,* 89 Yale L.J. 1125, 1132 (1980); Comment, *Inheritability of the Right of Publicity Upon the Death of the Famous,* 33 Vand.L.Rev. 1251, 1261 (1980); and Comment, *Torts-Right of Publicity-Descendibility of a Celebrity's Right to Benefit from Fame,* 47 Tenn.L.Rev. 886, 898–99 (1980).

440–41, 198 S.W. 258, 259 (1917); and *Third National Bank v. Divine Grocery Co.*, 97 Tenn. 603, 611, 37 S.W. 390, 392 (1896). See also R. Brown, *The Law of Personal Property* § 1.5, at 6 (3d ed. 1975) and 3 R. Pound, *Jurisprudence* § 133, at 126–28 (1959).

In its broadest sense, property includes all rights that have value. See R. Brown, *The Law of Personal Property* § 1.7, at 11 (3d ed. 1975). It embodies all the interests a person has in land and chattels that are capable of being possessed and controlled to the exclusion of others. *Watkins v. Wyatt*, 68 Tenn. (9 Baxt.) 250, 255 (1877) and *Townsend v. Townsend*, 7 Tenn. (1 Peck) 1, 17 (1821). Chattels include intangible personal property such as choses in action or other enforceable rights of possession. *Childress v. Childress*, 569 S.W.2d 816, 818 (Tenn.1978); *North v. Puckett*, 164 Tenn. 100, 105, 46 S.W.2d 73, 74 (1932); and *Sharp v. Cincinnati, N.O. & T.P. Ry. Co.*, 133 Tenn. 1, 6–7, 179 S.W. 375, 376 (1915).

Our courts have recognized that a person's "business," a corporate name, a trade name and the good will of a business are species of intangible personal property. *M.M. Newcomer Co. v. Newcomer's New Store*, 142 Tenn. 108, 118–19, 217 S.W. 822, 825 (1919) [trade name]; *Sanford-Day Iron Works v. Enterprise Foundry & Machine Co.*, 138 Tenn. 437, 440, 198 S.W. 258, 259 (1917) ["one's business"]; *Bradford & Carson v. Montgomery Furniture Co.*, 115 Tenn. 610, 618, 92 S.W. 1104, 1106 (1905) [good will]; and *Robinson v. Robinson's Inc.*, 9 Tenn.App. 103, 109 (1928) [corporate name].

■ Tennessee's common law thus embodies an expansive view of property. Unquestionably, a celebrity's right of publicity has value. It can be possessed and used. It can be assigned, and it can be the subject of a contract. Thus, there is ample basis for this Court to conclude that it is a species of intangible personal property.

### D.

■ Today there is little dispute that a celebrity's right of publicity has economic value. Courts now agree that while a celebrity is alive, the right of publicity takes on many of the attributes of personal property. It can be possessed and controlled to the exclusion of others. Its economic benefits can be realized and enjoyed. It can also be the subject of a contract and can be assigned to others.

■ What remains to be decided by the courts in Tennessee is whether a celebrity's right of publicity is descendible at death under Tennessee law. Only the law of this State controls this question. *Hartman v. Duke*, 160 Tenn. 134, 137, 22 S.W.2d 221–22 (1929) and *Jones v. Marable*, 25 Tenn. (6 Humph.) 116, 118 (1845). The only reported opinion holding that Tennessee law does not recognize a *postmortem* right of publicity is *Memphis Development Foundation v. Factors, Etc., Inc.*, 616 F.2d 956 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). We have carefully reviewed this opinion and have determined that it is based upon an incorrect construction of Tennessee law and is inconsistent with the better reasoned decisions in this field.

The United States Court of Appeals for the Sixth Circuit appears to believe that there is something inherently wrong with recognizing that the right of publicity is descendible. *Memphis Development Foundation v. Factors, Etc., Inc.*, 616 F.2d 956, 959–60 (6th Cir.1980). We do not share this bias. Like the Supreme Court of Georgia, we recognize that the "trend since the early common law has been to recognize survivability, notwithstanding the legal problems which may thereby arise." *Martin Luther King Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697, 705 (1982).

We have also concluded that recognizing that the right of publicity is descendible promotes several important policies that are deeply ingrained in Tennessee's jurisprudence. First, it is consistent with our recognition that an individual's right of testamentary distribution is an essential right. If a celebrity's right of publicity is treated

as an intangible property right in life, it is no less a property right at death. See *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 844 (S.D.N.Y.1975).

Second, it recognizes one of the basic principles of Anglo-American jurisprudence that "one may not reap where another has sown nor gather where another has strewn." *M.M. Newcomer Co. v. Newcomer's New Store*, 142 Tenn. 108, 118, 217 S.W. 822, 825 (1919). See also *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 580 n. 2, 97 S.Ct. 2849, 2860 n. 2, 53 L.Ed.2d 965 (1977) (Powell, J., dissenting); *Bi-Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 444 (1st Cir. 1985); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 838 (6th Cir. 1983); and *Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wisc.2d 379, 280 N.W.2d 129, 134 (1979).[6] This unjust enrichment principle argues against granting a windfall to an advertiser who has no colorable claim to a celebrity's interest in the right of publicity. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) and *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697, 705 (1982).[7]

Third, recognizing that the right of publicity is descendible is consistent with a celebrity's expectation that he is creating a valuable capital asset that will benefit his heirs and assigns after his death. See McLane, *The Right of Publicity: Dispelling Survivability, Preemption and First Amendment Myths Threatening to Eviscerate a Recognized State Right*, 20 Cal. W.L.Rev. 415, 421 (1983) and Kwall, *Is*

*Independence Day Dawning for the Right of Publicity?*, 17 U.C.D.L.Rev. 191, 212–13 (1983). It is now common for celebrities to include their interest in the exploitation of their right of publicity in their estate.[8] While a celebrity's expectation that his heirs will benefit from his right of publicity might not, by itself, provide a basis to recognize that the right of publicity is descendible, it does recognize the effort and financial commitment celebrities make in their careers. This investment deserves no less recognition and protection than investments celebrities might make in the stock market or in other tangible assets. See Hoffman, *The Right of Publicity—Heirs' Right, Advertisers' Windfall, or Courts' Nightmare?*, 31 DePaul L.Rev. 1, 27–28 (1981) and Felcher & Rubin, *The Descendibility of the Right of Publicity: Is There Commercial Life After Death?*, 89 Yale L.J. 1125, 1128–29 (1980).

Fourth, concluding that the right of publicity is descendible recognizes the value of the contract rights of persons who have acquired the right to use a celebrity's name and likeness. The value of this interest stems from its duration and its exclusivity. If a celebrity's name and likeness were to enter the public domain at death, the value of any existing contract made while the celebrity was alive would be greatly diminished. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) and *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697, 705 (1982).[9]

**6.** See also Kwall, *Is Independence Day Dawning for the Right of Publicity?*, 17 U.C.D.L.Rev. 191, 213 (1983) and Gordon, *Right of Property in Name, Likeness, Personality and History*, 55 Nw. U.L.Rev. 553, 613 (1960).

**7.** See also Halpern, *The Right of Publicity: Commercial Exploitation of the Associative Value of Personality*, 39 Vand.L.Rev. 1199, 1236–37 (1986); Kwall, *Is Independence Day Dawning for the Right of Publicity?*, 17 U.C.D.L.Rev. 191, 213 (1983); and Hoffman, *The Right of Publicity—Heirs' Right, Advertisers' Windfall, or Courts' Nightmare?*, 31 DePaul L.Rev. 1, 29 (1981).

**8.** *Hicks v. Casablanca Records*, 464 F.Supp. 426, 429–30 (S.D.N.Y.1978) and *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 838–39 (S.D.N.Y. 1975).

**9.** See also Kwall, *Is Independence Day Dawning for the Right of Publicity?*, 17 U.C.D.L.Rev. 191, 213 (1983) and Hoffman, *The Right of Publicity—Heirs' Right, Advertisers' Windfall, or Courts' Nightmare?*, 31 DePaul L.Rev. 1, 28 (1981).

Fifth, recognizing that the right of publicity can be descendible will further the public's interest in being free from deception with regard to the sponsorship, approval or certification of goods and services. Falsely claiming that a living celebrity endorses a product or service violates Tenn.Code Ann. § 47–18–104(b)(2), (3) and (5). It should likewise be discouraged after a celebrity has died.[10]

Finally, recognizing that the right of publicity can be descendible is consistent with the policy against unfair competition through the use of deceptively similar corporate names. *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 283 (S.D.N.Y.1977); *Memphis Development Foundation v. Factors, Etc., Inc.,* 441 F.Supp. 1323, 1327–28 (W.D.Tenn.1977); and *Uhlaender v. Henricksen,* 316 F.Supp. 1277, 1282 (D.Minn.1970).

■ The legal literature has consistently argued that the right of publicity should be descendible. A majority of the courts considering this question agree. *Acme Circus Operating Co. v. Kuperstock,* 711 F.2d 1538, 1543–44 (11th Cir.1983); *Martin Luther King, Jr. Center for Social Change Inc. v. American Heritage Products, Inc.,* 694 F.2d 674 (11th Cir.1983); *Factors, Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 222 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836, 844 (S.D.N.Y.1975); *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 823–24, 160 Cal. Rptr. 323, 329, 603 P.2d 425, 431 (1979); and *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.,* 250 Ga. 135, 296 S.E.2d 697, 705 (1982). We find this authority convincing and consistent with Tennessee's common law and, therefore, conclude that Elvis Presley's right of publicity survived his death and remains enforceable by his estate and those holding licenses from the estate.[11]

**E.**

While Tennessee's courts are capable of defining the parameters of the right of publicity on a case by case basis, the General Assembly also has the prerogative to define the scope of this right. The General Assembly undertook to do so in 1984 when it enacted Tenn.Code Ann. § 47–25–1101 *et seq.* which is known as "The Personal Rights Protection Act of 1984." Tenn.Code Ann. § 47–25–1103(a) recognizes that an individual has "a property right in the use of his name, photograph or likeness in any medium in any manner." Tenn.Code Ann. § 47–25–1103(b) provides that this right is descendible. Tenn.Code Ann. § 47–25–1104(a) & (b)(1) provide that the right is exclusive in the individual or his heirs and assigns until it is terminated. Tenn.Code Ann. § 47–25–1104(b)(2) provides that the right is terminated if it is not used after the individual's death.

■ Our decision concerning the descendibility of Elvis Presley's right of publicity is not based upon Tenn.Code Ann. § 47–25–1101 *et seq.* but rather upon our recognition of the existence of the common law right of publicity. We note, however, that nothing in Tenn.Code Ann. § 47–25–1101 *et seq.* should be construed to limit vested rights of publicity that were in existence prior to the effective date of the act. To do so would be contrary to Article I, Section 20 of the Tennessee Constitution. A statute cannot be applied retroactively to impair the value of a contract right in existence when the statute was enacted. *Massey v. Sullivan County,* 225 Tenn. 132, 135–36, 464 S.W.2d 548, 549 (1971) and *Collier v. Memphis Light, Gas & Water Division,* 657 S.W.2d 771, 775 (Tenn.Ct. App.1983).

## IV.

### *The Propriety of Granting a Summary Judgment*

Our finding that Elvis Presley's estate has retained the exclusive right to control

---

**10.** Halpern, *The Right of Publicity: Commercial Exploitation of the Associative Value of Personality,* 39 Vand.L.Rev. 1199, 1241 (1986).

**11.** There is some dispute concerning whether the right of publicity must be exercised while a

celebrity is alive in order to render it descendible. We need not decide this question in this case. There is no dispute in this record that Elvis Presley commercially exploited his right of publicity while he was alive.

the commercial exploitation of his name and likeness does not end our inquiry. Elvis Presley Enterprises, Inc. sought relief through a Tenn.R.Civ.P. 56 motion for summary judgment. It was entitled to this relief only if there are no disputes of material fact and if it satisfied the trial court that it was entitled to a judgment as a matter of law.

Elvis Presley Enterprises, Inc. must carry two burdens to be entitled to a judgment as a matter of law. First, it must satisfy the trial court that it is entitled to a judgment as a matter of law on one of its four alternative causes of action.[12] Second, it must also demonstrate that the International Foundation's defenses to its claims based upon estoppel by laches, acquiescence by estoppel and waiver are without merit.

■■■ Our task is simply to determine whether the requirements of Tenn.R.Civ.P. 56 have been met. *Hill v. City of Chattanooga*, 533 S.W.2d 311, 312 (Tenn.Ct.App. 1975). In doing so, we must view the pleadings and the other competent factual proof in a light most favorable to the opponent of the motion and must, likewise, draw all legitimate conclusions and inferences in the opponent's favor. *Jones v. Home Indemnity Insurance Co.*, 651 S.W.2d 213, 214 (Tenn.1983) and *Daniels v. White Consolidated Industries, Inc.*, 692 S.W.2d 422, 424 (Tenn.Ct.App.1985).

We have determined that Elvis Presley Enterprises, Inc. has made out a claim based upon the descendibility of Elvis Presley's common law right of publicity and upon its unfair competition claim.[13] However, viewing the proof in a light most favorable to the International Foundation, we have determined that Elvis Presley Enterprises, Inc. has not demonstrated that the International Foundation's laches defense is without merit as a matter of law.

■■■ The trial court dealt with the International Foundation's laches defense in the following manner:

> International's defense that EPE and Foundation's claims are barred by laches, acquiescence and waiver is not supported by the facts as presented. International has used the Elvis Presley name and likeness since its incorporation in 1981, but it never claimed an exclusive right to such use, nor did it attempt to interfere with EPE or Foundation's use until it filed this action. EPE and Foundation have never abandoned their rights and are entitled to the injunctive relief they seek.

This finding indicates that the trial court intermingled the legal elements of the International Foundation's unfair competition cause of action, its estoppel by laches defense and the Presley estate's four causes of action. It is based upon two erroneous premises: first, that the International Foundation's laches defense somehow depends upon the exclusivity of its right to use Elvis Presley's name and second, that the International Foundation's laches defense can succeed only if it can show that the Presley estate has abandoned its right to control Elvis Presley's name and likeness. Neither premise is correct. The International Foundation has never asserted that it has the exclusive right to use Elvis Presley's name and likeness and, in fact, neither its unfair competition claim nor its laches defense requires it to do so. The concept of "abandonment" envisions an affirmative act by the owner to relinquish its rights. The doctrine of laches involves a owner's negligent, inexcusable delay in protecting its rights. 3 R. Callman, *The Law*

**12.** Its amended answer and countercomplaint contains four theories of recovery: (1) the statutory protection of personal rights embodied in Tenn.Code Ann. § 47–25–1101 *et seq.*, (2) the common law right of publicity, (3) unfair competition, and (4) the trademark law at Tenn. Code Ann. § 47–25–501 *et seq.*

**13.** It is unnecessary to reach Elvis Presley Enterprises, Inc.'s claim based upon Tenn.Code Ann. § 47–25–1101 *et seq.* in light of our finding that Elvis Presley's common law right of publicity was descendible. Elvis Presley Enterprises, Inc.'s trademark claim is based upon Tenn.Code Ann. § 47–25–501 *et seq.*, not the common law. *Kirk v. Big Apple Supermarket of Cleveland*, 42 Tenn.App. 502, 504, 304 S.W.2d 511, 513 (1957). The factual proof in this record does not make out a violation of Tenn.Code Ann. § 47–25–511 as a matter of law.

*of Unfair Competition, Trademarks and Monopolies* § 19.64 (4th ed. 1983).

The defense of laches is based upon the doctrine of equitable estoppel. *State v. McPhail,* 156 Tenn. 459, 460, 2 S.W.2d 413 (1928) and *Hamilton National Bank v. Woods,* 34 Tenn.App. 360, 373, 238 S.W.2d 109, 115 (1948). Its essential elements include (1) an inexcusably long delay caused by the claimant's negligence in asserting its claim and (2) an injury to another's rights resulting from this delay. *In re Estate of Darwin,* 503 S.W.2d 511, 514 (Tenn.1973) and *W.F. Holt Co. v. A & E Electric Co.,* 665 S.W.2d 722, 736 (Tenn. Ct.App.1983). The success of the laches defense depends upon the facts and circumstances of each case. *Hannewald v. Fairfield Communities, Inc.,* 651 S.W.2d 222, 228 (Tenn.Ct.App.1983). The defense can be made out if claimant's actions amount to actual or constructive acquiescence in the defendant's conduct. *Clark v. American National Bank and Trust Company of Chattanooga,* 531 S.W.2d 563, 573 (Tenn. Ct.App.1974).

There is evidence in this record indicating that Elvis Presley Enterprises, Inc. was aware for over four years that the International Foundation was using Elvis Presley's name in its corporate name, that it acquiesced and even encouraged this use, and that the International Foundation relied upon Elvis Presley Enterprises, Inc.'s apparent acquiescence to its detriment.

The group desiring to form the International Foundation applied for a corporate charter in October, 1980. It sent a copy of this proposed charter to the Presley estate. Thus, the estate was aware as early as October, 1980 that the group intended to use Elvis Presley's name. The parties actually met in November, 1980 to discuss the group's use of Elvis Presley's name. The Presley estate corresponded with the group in December, 1980 offering it a roy-alty-free license to use Elvis Presley's name subject to certain condition.

The International Foundation did not accept this offer and in February, 1981, obtained a corporate charter including Elvis Presley's name in its corporate name. There is no evidence that the Presley estate formally objected to the International Foundation's continued use of Elvis Presley's name after February, 1981. There is, however, evidence that the Presley estate was aware of the Foundation's use of Elvis Presley's name and acquiesced and even promoted this use.

The International Foundation was on the Presley estate's mailing list. The International Foundation made financial contributions to the Presley estate's campaign to construct a fountain near Graceland. Representatives of the Presley estate discussed the International Foundation's activities with foundation representatives. The Presley estate published announcements of the International Foundation's activities in its newsletter. Finally, the Presley estate regularly purchased tickets to the International Foundation's annual banquet.

There is also evidence that the International Foundation relied to its detriment upon the Presley estate's apparent acquiescence in its use of Elvis Presley's name. It has solicited funds and sponsored various activities. It has also entered into contracts for marketing and promotion.

The defense of laches is available in cases such as this one even if it is not rigidly enforced. *C.F. Simmons Medicine Co. v. Mansfield Drug Co.,* 93 Tenn. 84, 146–47, 23 S.W. 165, 182 (1893) and *Supreme Lodge Knights of Pythias v. Grand Lodge Knights of Pythias,* 2 Tenn.Civ.App. (Higgins) 429, 441 (1911). See also *Tandy Corp. v. Malone & Hyde, Inc.,* 581 F.Supp. 1124 (M.D.Tenn.1984), *rev'd on other grounds,* 769 F.2d 362 (6th Cir.1985).[14] This record does not support finding that the International Foundation has carried its

---

14. This reversal was predicated upon the fact that the applicable statute of limitations had not yet run. Tenn.Code Ann. § 28–3–105 provides that the applicable statute of limitations in cases such as this one is three years. Elvis Presley Enterprises, Inc. asserted its claim over four years after the International Foundation received its corporate charter in which Elvis Presley's name was included in its corporate name.

burden of proof with regard to its laches defense. However, it does not support finding that Elvis Presley Estate, Inc. is entitled to a judgment as a matter of law.

## V.

The summary judgment granted in favor of Elvis Presley Enterprises, Inc. is vacated and the case is remanded for further proceedings consistent with this opinion. The costs of this appeal are taxed in equal portions to the Elvis Presley International Memorial Foundation and Elvis Presley Enterprises, Inc. and their respective sureties for which execution, if necessary, may issue.

TODD, P.J. (M.S.), and CANTRELL, J., concur.