**DUNKIN' DONUTS INCORPORATED, Plaintiff,**

v.

**BARR DONUT, LLC, Alexander Barrett, Oshrie Sak, SRS Donuts Corp., and Scott Glassman, Defendants.**

**Dunkin' Donuts Incorporated, Plaintiff,**

v.

**Barr Donut, LLC, Defendant.**

**Nos. 00 CIV.6130 HB, 01 CIV.5872 HB.**

United States District Court, S.D. New York.

Jan. 17, 2003.

David E. Whorten, Eric L. Yaffe, Mari-Rae Sopper, Christopher M. Loveland, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Ronald D. Degen, O'Rourke & Degen, New York City, for Dunkin Donuts, Inc.

Barbara R. Shweky, Peter S. Cohen, Olshan, Grundman, Frome & Rosenzweig, New York City, for Barr Donut, LLC, David Spindler, Oshrie Zak.

David Segal, New York City, for Alexander Barrett.

Andrew Paul Cooper, Mineola, NY, for SRS Donuts Corp., Scott Glassman.

## *OPINION & ORDER*

BAER, District Judge.

This matter came before me while I sat in the Eastern District of New York in August 2002 and was transferred to me for all purposes by Judge Seybert. Docket numbers 00 Civ. 6130 and 01 Civ. 5872 were consolidated by order dated September 25, 2002. Two motions for partial summary judgment are before me. First, Dunkin' Donuts Incorporated ("Dunkin'") moves pursuant to Fed.R.Civ.P. 56 for partial summary judgment on count I of its complaint against Barr Donut, LLC ("Barr") on the ground that Barr failed to comply with the express terms of the parties' franchise agreement by maintaining a shop far below Dunkin's acceptable standards for health, sanitation, and safety. Second, Dunkin' moves for summary judgment against Barr, Alexander Barrett ("Barrett"), and Oshrie Zak ("Zak") (collectively, the "Barr defendants") on counts IV, V, and VI of Dunkin's third amended complaint for the Barr defendants' violation of three different provisions of the franchise agreement.[1] Further, Dunkin' also moves for summary judgment against SRS Donuts Corp. ("SRS") and Scott Glassman ("Glassman") seeking a declaratory judgment that SRS and Glassman no longer have a conditional option to re-enter the Barr Donut franchise because of the termination of the Barr franchise agreement. Defendants Barr and Zak have cross-moved for partial summary judgment on the same three counts asserted in Dunkin's third amended complaint. For the reasons set forth below, Dunkin's motion for partial summary judgment against

Barr with respect to count I of its first complaint is granted, and Dunkin's motion for partial summary judgment against the Barr defendants on count V of its third amended complaint is also granted. Further, Dunkin's motion for a declaratory judgment that SRS and Glassman no longer have a conditional option to re-enter the Barr Donut franchise because of the termination of the Barr franchise agreement is granted. Dunkin' has agreed in open court that a decision of this nature releases the entire case and that it will seek no damages save attorney's fees to be decided on papers. As to that award, submissions from the plaintiff will be due by the end of January and any objections within two weeks thereafter.

## I. BACKGROUND

As a preliminary matter, and with respect to both motions before me, the submissions by the Barr as well as the SRS and Glassman defendants are deficient. Specifically, Local Civil Rule 56.1 of the United States District Court for the Southern and Eastern Districts of New York requires a party opposing a motion for summary judgment to submit a counter-statement of facts as to which a triable issue remains and which "may not rest upon the mere allegations or denials of [his] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Sterbenz v. Attina,* 205 F.Supp.2d 65, 67 (E.D.N.Y.2002) (stating "[w]here plaintiff has not responded to defendants' factual assertions—all of which are established by documentary evidence and/or the deposition testimony of plaintiff

---

1. Count IV is brought against the Barr defendants for breach of the franchise agreement, ¶ 1.3. Count V is brought against the Barr defendants for breach of the Barr franchise agreement, ¶ 5.1.7. And Count VI is brought against the Barr defendants for breach of the franchise agreement, ¶ 8.0.1. As noted *infra,*

because I do not need to find that the Barr defendants violated all three provisions of the franchise agreement alleged in Dunkin's third amended complaint and at issue in this motion to find that the agreement is terminated, I will limit my analysis to Dunkin' motion with respect to count V exclusively.

or her counsel—this Court has deemed those facts to be uncontroverted") (*citing* Fed.R.Civ.P. 56(e) (2002)); *see also* Local Civ. R. 56.1(b). In addition, "[e]ach statement of material fact by a movant or opponent must be followed by citation to [admissible] evidence." Local Civ. R. 56.1(d) (*citing* Fed.R.Civ.P. 56(e)). Finally, the facts presented in the movant's statement—in this case, Dunkin's—"will be deemed to be admitted unless controverted" by the opposing party's statement. Local Civ. R. 56.1(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Millus v. D'Angelo,* 224 F.3d 137, 138 (2d Cir. 2000); *Sterbenz,* 205 F.Supp.2d at 67. Here, defendants Barrett, SRS, and Glassman did not submit a proper counter-statement controverting Dunkin's statement of material facts as required under Local Rule 56.1(b) with respect to Dunkin' partial summary judgment on count I of plaintiff's complaint. Further, defendants Barr and Zak failed to include citations to evidence in their counter-statement of facts, and largely denied Dunkin's statement of facts on the ground that those facts are inadmissible—a contention with which I disagree for reasons detailed *infra.* With respect to Dunkin's motion for summary judgment on counts IV, V, and VI of its third amended complaint, Barr has simply provided its own statement of facts without at all attempting to controvert plaintiff's statements. Because the opposing parties have therefore failed to comply with Local Rule 56.1, Dunkin's facts will be deemed admitted for the purpose of both motions.

### 1. Facts Relevant to Dunkin's Motion for Summary Judgment on Count I of its Complaint

Dunkin' is a Delaware Corporation with its principal place of business in Randolph, Mass. It is engaged in the business of franchising independent business persons to operate Dunkin' Donuts shops throughout the United States. (Pl.'s Rule 56.1 Statement ¶ 1 for 01 Civ. 5872). Dunkin' is the franchiser of the Dunkin' Donuts franchise system. In addition, Dunkin's wholly-owned subsidiary, Dunkin' Donuts USA, Inc., is the owner of the trademark, service mark, and trade name DUNKIN' DONUTS and related marks. (*Id.* ¶ 3). Dunkin' Donuts USA, Inc. owns a number of federal registrations for the mark "Dunkin' Donuts" and related marks. (*Id.* ¶ 4).

Defendant Barr is a New York Limited Liability Company, with its principal place of business in Melville, New York. (*Id.* ¶ 12). From in or about June 1998 to the present, Barr has been the owner and operator of the Melville Dunkin' Shop pursuant to a franchise agreement dated June 9, 1998 ("franchise agreement" or "agreement"). (*Id.*). Dunkin' provides each of its franchisees with a set of manuals and guidelines that set forth in detail the procedures, methodology, and standards applicable to the operation of a Dunkin' shop. (*Id.* ¶ 13). Paragraph 5.0 of the franchise agreement provides the following:

> FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for Dunkin' Donuts products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS .... (Laudermilk Cert. (00 Civ. 6130) Ex. C).

In addition, paragraph 5.1.7 of the agreement provides that the franchisee will

> comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, the Board of Fire Underwriters and other similar organi-

zations and all governmental agencies, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop. (*Id.* ¶ 5.1.7). The franchise agreement also reserved to Dunkin' the right to inspect the shop in order "to assure that [the items therein] conform to the standards and specifications of the Dunkin' Donuts System." (*Id.* ¶ 6.0). If Dunkin' found what it believed to be a violation of a standard relating to health, sanitation, or safety, Dunkin' would notify the franchisee in writing of the violation within 24 hours; if it did not cure the violation within that time period, the franchisee would be held in default under the franchise agreement. (*Id.* ¶ 9.0.2).

On June 15, 2000, Barr's shop was inspected by a Dunkin' representative, Jeff Polizotto, who found a number of violations relating to health, sanitation, and safety. (Pl.'s Rule 56.1 Statement ¶ 21, Exs. 3 & 4). Accordingly, Dunkin' gave Barr a notice to cure the violations. When the shop was re-inspected on June 19, 2000, Polizotto found that the violations had not been cured. (*Id.* ¶ 23, Exs. 3 & 4). The shop was inspected again on May 4, 2001. (*Id.* ¶ 24; Polizotto Cert., Ex. 6). During a 15-minute inspection, Polizotto again found a number of violations relating to health, sanitation, and safety. (*Id.*). Once again, Dunkin' gave Barr a notice to cure the violations and found that the violations remained uncured when Dunkin' once again inspected the shop on May 7, 2001. (*Id.* ¶ 26, Ex. 6). The same cycle of inspection-notice-failure to cure occurred a third time beginning on August 10, 2001. (*Id.* ¶ 27). Dunkin' hand-delivered to Barr a notice to cure on August 10, 2001, which identified violations and demanded that Barr cure the violations within 24 hours. (*Id.* ¶ 28, Ex. 6). Because Barr failed to cure these violations when the shop was re-inspected on August 12, 2001—at which time Polizotto found a number of violations, including the presence of mouse droppings, flies, stagnant water collecting on the floor, and expired food products (*Id.* ¶ 29, Ex. 6)— Dunkin' found that Barr was in breach of the franchise agreement. (*Id.* ¶ 31).

Barr counters that it had the shop inspected on August 13, 2001 by its own inspector, Yankee Exterminating Co, Inc., who found "no evidence of insect or rodents inside or outside the facility." (Def.'s Rule 56.1 Statement ¶ 9, Ex. 12). Barr further submits that the Yankee inspector's observations are consistent with those of the landlord at 116 Broad Hollow Road, where the Melville shop is located, who claims that he saw no evidence of vermin infestation in the shop during his dealings with the shop. (*Id.* ¶ 10, Ex. 13). In addition, Barr contends that Dunkin' had a duty to help it deal with the alleged violations both after the May and August 2001 violations, but that to this date Dunkin' has failed to "lift a finger to assist Barr in dealing with the alleged standards violations." (*Id.* ¶ 12). Specifically, Barr claims that since it purchased the franchise, Sonja Sorochinsky, the representative manager and Barrett's wife, has not been provided training at Dunkin's corporate training center, and presumably for this reason has failed to comply with the sanitation provisions under the franchise agreement. (Def.'s Rule 56.1 Statement ¶ 4).

On August 20, 2001, Dunkin' served a supplemental notice of termination on Barr, terminating the franchise agreement and demanding that Barr immediately comply with its post-termination obligations as set forth in the franchise agreement. (Pl.'s Rule 56.1 Statement ¶ 31, Laudermilk Cert. Ex. H). To date, Barr has refused to do so and is presently operating its shop as if it were a licensed Dunkin' franchisee. (*Id.* Ex. 1, ¶ 18). Shortly thereafter, Dunkin' moved for a

preliminary injunction and order terminating the parties' franchise agreement and enjoining Barr's unauthorized use of plaintiff's trademarks and trade dress and enjoining Barr from engaging in unfair competition in violation of the Lanham Act.

A preliminary injunction hearing was held before me in the Eastern District of New York on August 23, 2002. At that hearing, Sorochinsky admitted that the oven was not up to Dunkin's standards and had more than one day's worth of buildup, and that the food preparation area and equipment needed to be cleaned. (*Id.* Ex. 2, 173–74; 177–79). In addition, hundreds of photographs were admitted into evidence depicting mold, flies, and other serious health and sanitation violations at Barr's shop. (*Id.* Ex. F). Dunkin' now moves for summary judgment on the question of whether Barr has breached the franchise agreement by failing to maintain sanitary conditions.

### 2. Facts Relevant to Barr · defendants on Dunkin's Motion re: Count V of its Third Amended Complaint

Defendant Barrett was the managing member and 75% owner of Barr at all times during which Barr was licensed to operate the Melville Dunkin' Shop. (Pl.'s Rule 56.1 Statement ¶ 5). Defendant Zak ("Zak") was a member and 12.5% owner of Barr at all times during which Barr was licensed to operate the Melville Dunkin' Shop. (*Id.* ¶ 6). Defendant SRS, a New York corporation, was a Dunkin' franchisee for the Melville Shop before Barr became the franchisee. (*Id.* ¶ 8). Defendant Glassman personally guaranteed and agreed to perform SRS's obligations pursuant to the SRS franchise agreement. (*Id.* ¶ 9). Pursuant to paragraph 1.3 of the Barr franchise agreement, Barr warranted that "all financial and other information which FRANCHISEE has provided to DUNKIN' DONUTS in connection with FRANCHISEE'S application for this Dun-

kin' Donuts franchise is true and accurate." (*Id.* Ex. C, ¶ 1.3). Pursuant to paragraph 5.1.7, Barr agreed to

> comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, the Board of Fire Underwriters and other similar organizations and all governmental agencies, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop. (*Id.* Ex. C, ¶ 5.1.7).

Pursuant to paragraph 8.0.1 of the agreement, Barr agreed not "to do or perform, directly or indirectly, any act injurious or prejudicial to the good will associated with Dunkin's proprietary marks and the Dunkin' system." (*Id.* ¶ 10, Ex. C, ¶ 8.0.1). In addition, under paragraph 9.1.3, Barr is not entitled to any cure period if it "falsified financial data or otherwise commits an act of fraud with respect to its rights or obligations under this Agreement." (*Id.* ¶ 11, Ex. C ¶ 9.1.3). Finally, pursuant to paragraphs 9.3 and 9.4.1 of the agreement, Barr agreed that it would pay to Dunkin' all damages with interest, costs and expenses, including reasonable attorney's fees, incurred by reason of Barr's default and termination. (*Id.* ¶ 13, Ex. C ¶ 9.4.1).

Barrett purchased the Dunkin' franchise from the Glassman and SRS defendants on June 9, 1998. On his application, Barrett falsified both his employment history and his educational background. (*Id.* ¶¶ 24–26). Less than one year later, in May 1999, Barrett was charged in a four-count indictment for, *inter alia*, conspiracy to possess marijuana with the intent to distribute and possession with the intent to distribute. (*Id.* ¶ 42). In August 1999, Barrett participated in a proffer session with the United States Attorney's Office in Tucson, Arizona pursuant to which he

agreed to discuss matters of interest to the United States Attorney in exchange for a promise by the government that the information would not be used against Barrett in any other proceeding. (Barrett's Rule 56.1 Statement ¶ 8). Barrett maintains that he made incriminating statements to AUSA Huellmantel and Charles Hammock, a detective for the Arizona Department of Public Safety, with the full expectation that those statements would remain secret in accordance with the terms of the proffer agreement. (*Id.* ¶ 10).[2] On August 11, 2000, Dunkin' sent Barr a notice of termination for, *inter alia,* Barrett's arrest for possession of illegal drugs, the use of illegal drug money to purchase the Melville franchise, and failing to provide true and accurate information to Dunkin' in connection with his application to purchase the franchise in violation of paragraphs I.3, 5.1.7, and 8.0.1 of the franchise agreement. To date, Barr has refused to comply with its post-termination obligations and is presently operating its shop as if it were a licensed Dunkin' franchisee. (Pl.'s Rule 56.1 Statement ¶ 43).

On or about October 19, 2001, Barrett signed a waiver of indictment waiving "prosecution by indictment and consent[ing] that the proceeding may be by information rather than indictment." (*Id.* ¶ 44, Ex, 13). When Barrett was asked to authenticate his signature on the waiver of indictment during his deposition in the instant case, he invoked his Fifth Amendment privilege and refused to testify. (*Id.* Ex. 3 at 80–81). On October 19, 2001, Barrett pled guilty to an Information which stated

[t]hat on or about January 1992, to on or about May 1999, at or near Tucson, in the District of Arizona, Alexander Barrett, named herein as defendant and co-conspirator, did knowingly and intentionally, combine, conspire, confederate and agree together and with Martin Molina, and with other persons to possess with intent to distribute marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1). (*Id.* ¶ 45, Ex. 3 at 81).

Barrett was sentenced to a term of 72 months on or about January 4, 2002, and is currently an inmate at a federal corrections facility. (*Id.* ¶ 46). At some time after Barrett pleaded guilty, Judge Zapata of the United States District Court for the District of Arizona, at Barrett's request, sealed the records of his conviction. (*Id.* ¶ 33 n. 5).

Dunkin' contends that the following information is admissible for the purpose of its motion for partial summary judgment against the Barr defendants. For reasons set forth *infra,* I agree with Dunkin' with respect to the admissibility of the following facts.

Barrett told investigators that, during the summer of 1997, he learned that a Dunkin' franchise was for sale in Melville, New York while he was looking for ways to legitimize the profit he gained from smuggling marijuana. (Pl.'s Rule 56.1 Statement ¶ 15, Hammock Cert. Attached as Ex. 6). Barrett and Glassman executed their first purchase and sale agreement for the Melville Shop on October 31, 1997.

---

**2.** It is Barrett's contention that the information supplied by Detective Hammock is inadmissible in this action, and has in fact been the subject of federal litigation in the United States District Court in Arizona. (Barrett's Rule 56.1 Statement ¶ 17). However, as discussed in greater detail *infra,* Judge Browning of the District of Arizona, whose order permitted Dunkin' to obtain testimony from Hammock with respect to the admissions made by Barrett, has already rejected Barrett's argument with respect to the alleged confidentiality of the proffer sessions and any information relating thereto. (Pl.'s reply memorandum Ex. 2).

(*Id.*). At that same time, Barrett was purchasing 600 pounds of marijuana each month. (*Id.* Ex. 6 ¶ 3). Dunkin' maintains that it would not have permitted Barrett to become a franchisee if it had known that Barrett was involved in the sale of illegal drugs—a fact which Barrett did not reveal on his resume for obvious reasons. (*Id.* ¶¶ 19, 21). In addition, Dunkin' maintains that Barrett lied on his application by falsifying prior employment history, information about his references, and his educational background. (*Id.* ¶ 24). At his deposition in the instant action, Barrett invoked his Fifth Amendment privilege when questioned with respect to these issues, including whether he had ever received "salary" checks from Zak, a 12.5% owner of Barr Donut, LLC. (*Id.* ¶ 26). Specifically, Barrett admitted to investigators that he was approached in 1995 by Zak, who proposed that he launder money for Barrett at a rate of 15%. Barrett agreed, and Zak began to issue checks to Barrett from the account of "Zak, Esquire." (*Id.* ¶ 27, Ex. 6 ¶ 3). Barrett also told investigators that in 1997, Zak agreed to continue laundering money but wanted the total amount to be laundered to be given to him in the beginning of the year. (*Id.* ¶ 28, Ex. 6 ¶ 3). Barrett admitted to investigators that he laundered money through Zak from 1996 to June 1998, when he could begin to legitimize his money with W-2's issued from the Dunkin' Donuts shop. (*Id.*, Ex. 6 ¶ 3). During his deposition in the instant case, Barrett invoked his Fifth Amendment privilege when asked questions pertaining to money laundering and the payments from Zak. (*Id.* ¶ 29). During Zak's deposition, Zak testified that he did not remember if he ever employed Barrett or why the checks issued to Barrett had the word "salary" on the memo line, despite the fact that thirty-seven checks were indisputably issued each week from 1995 through 1998 from the account of "Oshrie Zak, Esquire" to Alexander

Barrett. (*Id.* ¶ 30). It goes without saying that Barrett failed to include any reference to his involvement in the sale of illegal drugs on his Dunkin' application. (*Id.* ¶ 32, Ex. 10).

Two months prior to the closing of the sale of the Dunkin' franchise to Barr, in or about April 1998, Barrett traveled to Tucson, Arizona with marijuana in a rental vehicle. Upon discovering the drugs, the Arizona Department of Public Safety arrested Barrett. When asked during his deposition whether he was arrested in 1998, Barrett once again invoked his Fifth Amendment privilege. (*Id.* ¶ 36, Ex. 6 ¶ 3). Barrett told investigators that in May 1998, around the same time that he executed a waiver letter with the SRS and Glassman defendants, he supplied $140,000 for the purchase of 200 pounds of marijuana. Also, in May 1998, a month before Barrett purchased the Dunkin' franchise, Barrett placed approximately $1,500,000 to $2,000,000 into a storage unit at Bulwark Storage. (*Id.* ¶ 37, Ex. 6 ¶ 3). On June 9, 1998, Barr used money obtained from the sale of illegal drugs to purchase the Barr franchise from defendants SRS and Glassman. (*Id.* ¶ 38, Ex. 6 ¶ 3). On or about this same time, Barrett paid over $300,000 cash to defendants SRS and Glassman "under the table" for the purchase of the Melville Shop. (*Id.* ¶ 39, Ex. 6 ¶ 3). This payment was in addition to the amount specified in the purchase and sale agreement and was not reported to Dunkin.' (*Id.*). While operating the Melville Shop, Barrett continued his involvement in the sale of marijuana. (*Id.* ¶ 41). For instance, in or about October or November 1998, approximately four to five months after entering into the franchise agreement, Barrett made arrangements for shipments of 50 to 60 pounds of marijuana to be shipped from Arizona to New York, where Barrett distributed his portion. Barrett made a profit of approximately

$200 per pound. (*Id.* Ex. 6 ¶ 3). When asked whether he was engaged in distributing marijuana in Arizona after opening the Melville Shop, Barrett invoked his Fifth Amendment privilege and refused to testify. (*Id.* Ex. 3 at 20). In addition, Barrett invoked his Fifth Amendment privilege and refused to testify once again when asked whether he received money from the sale of drugs after he opened the Dunkin' shop. (*Id.* Ex. 3 at 49).

### 3. *Facts Relevant to defendants SRS and Glassman on Dunkin's Motion for a Declaratory Judgment*

With respect to the SRS and Glassman defendants, in July 1997 Dunkin' terminated the SRS franchise agreement for the underreporting of sales. Pursuant to the terms of a settlement executed by the parties on or about December 10, 1997, SRS and Glassman were provided an opportunity to sell their franchise. (*Id.* ¶ 47). On or about June 9, 1998, Glassman and SRS executed an agreement to transfer the Dunkin' shop to Barr Donut, LLC by the sale of assets; the transfer agreement contained Dunkin's standard form "conditional option to re-enter" agreement. Specifically, section III of the transfer agreement provided Glassman and SRS with a conditional option to re-enter the Melville franchise because they were providing purchase money financing to the transferee, in this case Barr Donut. (*Id.* ¶ 49).

> Paragraph 3.0.1: TRANSFEROR shall cure all monetary and non-monetary defaults of TRANSFEREE under all agreements with DUNKIN' DONUTS, including, without limitations, the Franchise Agreement and (if applicable) LEASE, without set-off or offset of any kind or nature, including, but not limited to, franchise fees, advertising fees, rent, tax escrow, percentage rate, collection fees, legal fees, interest, promissory note payments, equipment agreement payments, and any and all other sums whatsoever owed to DUNKIN' DONUTS and/or LESSOR;
>
> Paragraph 3.0.2: TRANSFEROR shall cure all violations, including, without limitation, standards, maintenance and contractual violations, at the DUNKIN' DONUTS SHOP, no later than the date of re-entry. However, if any violation by its nature cannot be cured prior to re-entry, TRANSFEROR shall be deemed to have complied with this condition if TRANSFEROR pays into escrow with DUNKIN' DONUTS funds sufficient, in DUNKIN' DONUTS' judgment, to cure the violations within a period of time and in a manner satisfactory to DUNKIN' DONUTS;
>
> Paragraph 3.2: **TRANSFEROR shall have the right to re-enter and operate the DUNKIN' DONUTS SHOP for the term commencing with the date of re-entry and ending ninety days following the date of re-entry.** TRANSFEROR'S re-entry shall be for the sole purpose of enabling TRANSFEROR to resell the Dunkin' Donuts to a new transferee approved by DUNKIN' DONUTS. If TRANSFEROR re-enters the DUNKIN' DONUTS SHOP and fails to conclude a transfer thereof within such period, TRANSFEROR'S rights under the re-entry franchise agreement and (if applicable) LEASE shall terminate without notice or demand by DUNKIN' DONUTS, and following expiration of such period TRANSFEROR shall promptly vacate the premises, remove TRANSFEROR'S personal property therefrom, and peaceably surrender possession of the premises to DUNKIN' DONUTS. (*Id.* ¶ 50 Ex. 16 (emphasis added)).

At or around the same time, defendants Glassman, Barrett, and Zak executed a waiver letter, which stated that "[t]he conditional option to re-enter agreement and

all rights granted to transferor [SRS and Glassman] thereunder shall extinguish and be of no further force and effect upon the expiration or termination of the transferee's franchise agreement." (*Id.* ¶ 53 Ex. 17, § g). In other words, should the franchise agreement be terminated, Glassman's and SRS' conditional option to re-enter under paragraph 3.2 of the transfer agreement would be extinguished.

## II. ANALYSIS

### 1. Standard of Review for Both Motions

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact are in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed. R.Civ.P. 56(c). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (*quoting Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992)). The court resolves all ambiguities and draws all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide. *Aldrich,* 963 F.2d at 523.

### 2. Dunkin's Motion for Partial Summary Judgment Against Barr on Count I of its Complaint

Dunkin' maintains that it is undisputed that Barr has consistently failed to maintain its shop according to Dunkin's standards for health, sanitation, and safety, and has failed to cure such violations within 24 hours as required under the franchise agreement. Specifically, Dunkin' contends that Barr has "made it a practice" to (1) allow mice, cockroaches and flies to roam free throughout the establishment; (2) store perishables at potentially

hazardous temperatures; (3) store food unprotected from contamination; (4) have food products not within their code date; (5) not sanitize, clean, and rinse equipment at a proper frequency; (6) leave imminent health hazards untreated; and (7) generally refuse to comply with its duty to maintain a clean and sanitary shop. (Pl.'s memorandum at 2). The series of inspections that occurred beginning on June 15, 2000 document the violations that led to the termination of Barr's franchise agreement. Further, Dunkin' also maintains that Barr's violations also constitute actions injurious or prejudicial to the goodwill of Dunkin's proprietary marks—a separate breach of the franchise agreement. (*Id.* at 3).

Dunkin' cites a number of cases for the proposition that a franchise may be terminated if a franchisee fails to comply with health and safety standards. In a case involving facts similar to this case, *Dunkin' Donuts, Inc. v. Donuts, Inc.,* the district court for the Northern District of Illinois held that "the violations caused both shops to fall below any reasonable standard of sufficient sanitation, health and safety standards and constitute material breaches of the Franchise Agreement." 2000 WL 1808517, at *5 (N.D.Ill. Dec.6, 2000); *see also McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1309 (11th Cir. 1998) (franchisee's "failure to comply with McDonald's QSC and food safety standards constituted a material breach of the franchise agreement sufficient to justify termination").

Barr fully admits that "a franchisee's violation of [Dunkin's] standards for health, sanitation, and safety would permit [Dunkin'] to terminate the franchise agreement." (Def.'s memorandum at 3). However, Barr maintains that there is still a genuine issue of material fact as to whether it ever committed any health, sanitation,

or safety violations. (*Id.*). Specifically, Barr relies on the reports of its own inspectors—Yankee Inspectors—who reported that there has never been an insect or rodent infestation problem during the time that Yankee has been servicing the franchise. (*Id.* at 4). Further, Barr distinguishes the main case cited by Dunkin,' *Dunkin' Donuts Inc. v. Donuts, Inc.*, on the ground that in that case the plaintiff provided reports documenting the defendant's violations from both its own investigator and the Health and Environment Coordinator for the relevant locality, thereby providing independent verification of the plaintiff's allegations. By contrast, here Barr *claims*—entirely without support—that it has always passed the inspections by the Nassau County/Town of Melville health inspector. For instance, Barr asserts that it passed two health department inspections that were made on April 19 and June 11, 2001, respectively, although fails to provide any verification whatsoever in support thereof. (*Id.* at 6). In Barr's view, "the inspections by local health officials cast that much more doubt on the credibility of the witnesses relied on by [Dunkin'] in making its case for summary judgment." (*Id.*). However, as noted, Barr fails to provide *any* documentary proof of these so-called "local health officials" and their alleged inspections of the Melville shop. In the alternative, Barr contends that Dunkin' cannot terminate the franchise agreement as a matter of law because it was Dunkin,' not Barr, that breached that agreement by failing to provide Barr employees with training that would allow them to maintain the standards required under the agreement. Specifically, pursuant to paragraph 2.2 of the franchise agreement, Dunkin' agreed to make available to the franchisee prior to the initial opening of the shop "a training program with respect to the operation of the Dunkin' Donuts System, at the Dunkin' Donuts University Corporate Training Center," as well as "[t]o provide operating procedures to assist FRANCHISEE in complying with DUNKIN' DONUTS' standard methods." (Pl.'s Rule 56.1 Statement, Laudermilk Cert. Ex. C).

In its reply brief, Dunkin' counters, and I agree, that Barr's statements with respect to the Yankee inspector and the Nassau Health Department inspections are completely uncorroborated. For instance, with respect to the Yankee inspector, Barr relies on unauthenticated letters that it submitted as exhibits to its opposition to Dunkin's motion for a preliminary injunction. Similarly, Barr fails to include any Nassau Health Department reports or other documentation that demonstrate whether an inspection even took place and, if so, what were the results of that inspection. In any event, Dunkin' maintains that it does not even need "independent confirmation" to demonstrate Barr's breaches of the franchise agreement with respect to health and sanitation standards. Finally, Dunkin' submits that, as a matter of law, any "alleged" breach of the franchise agreement by Dunkin' does not excuse Barr from its own failure to abide by the terms of the franchise agreement, and that, as a matter of fact, Dunkin' did not breach the agreement by failing to provide proper counseling.

I find that Dunkin' has demonstrated that no genuine issue of material fact exists that would defeat its motion for summary judgment with respect to count I of its complaint against Barr. First, the Yankee inspection report fails to raise an issue of fact with respect to sanitary conditions at the shop. Although the letter dated September 19, 2001 states that "[t]he premises have not had an insect or rodent infestation problem since our company's services have been enlisted" (Def.'s Rule 56.1 Statement, Ex. 11), Barr has failed not only to authenticate this letter but also

to provide any standards that the Yankee inspector as well as the landlord relied on when evaluating the shop. Second, the photographs from the August 12, 2001 inspection that have been admitted into evidence—depicting, *inter alia,* mold, flies, food stored on filthy surfaces, open flour bags, stagnant water, and mouse droppings—indisputably reveal a store with serious sanitation problems. (Pl.'s Rule 56.1 Statement, Ex. F). Although Barr submitted into evidence its own photographs depicting a much more sanitized version of the store (Def.'s Rule 56.1 Statement, Ex. 16), those photographs are dated August 2002—one year after the August 12, 2001 re-inspection of the premises. The franchise agreement clearly states that Barr had one day, not one year, to cure violations that were reported by Dunkin.' Finally, Barr has failed to establish that it was Dunkin,' not Barr, that violated the franchise agreement by failing to provide training with respect to health and sanitation standards. Even assuming that Dunkin' did breach the franchise agreement—which it did not [3]—Barr cannot rely on Dunkin's alleged wrongdoing to avoid the consequences of its own breach. *See., e.g., Dunkin' Donuts, Inc. v. Liu,* 2000 WL 1868386, at *4 (E.D.Pa. Dec.21, 2000) (stating that "[d]efendants can assert their own claim against Dunkin' but cannot rely on Dunkin's wrongdoing to avoid the consequences of their own non-performance"). In any event, Dunkin' has adduced overwhelming evidence that it fully complied with its obligation to make assistance available to Barr. Polizotto testified at the preliminary injunction hearing that after each inspection he discussed at length the results with Sorochinsky and explained what steps were necessary to operate the shop in compliance with Dunkin's stan-

dards; further, Sorochinsky herself testified that she had personally reviewed training manuals, a video training system, and an interactive CD–ROM training program that Dunkin' made available to her. (Pl.'s Rule 56.1 Statement Ex. 3 at 120–21). Accordingly, Dunkin's motion for summary judgment on count I of its complaint is granted, and the parties' franchise agreement is terminated.

### 2. Dunkin's Motion for Summary Judgment Against the Barr defendants on Count V of Dunkin's Third Amended Complaint

■ Dunkin' maintains that it is entitled to summary judgment on counts IV, V, and VI of its third amended complaint because there is no genuine issue of material fact that (1) Barrett used money obtained from the sale of illegal drugs to purchase the franchise; (2) Barrett purchased the franchise to launder money obtained from the sale of illegal drugs; (3) money obtained from the sale of illegal drugs was laundered through the Dunkin' franchise; (4) Barrett provided false information to Dunkin' in connection with its application to become a franchisee; and (5) Barrett pled guilty to conspiracy to possess marijuana with intent to distribute. Because I do not need to find that the Barr defendants violated all three provisions of the franchise agreement to find that the agreement is terminated, I will limit my analysis to Dunkin' motion with respect to count V.

Count V charges the Barr defendants with breach of paragraph 5.1.7 of the franchise agreement, which states that the franchisee will "comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities ...." First, Dunkin' maintains that the

---

**3.** By its express terms, the agreement obligates Dunkin' to make its training "available" to the franchisee. In other words, the agree-

ment does not obligate Dunkin' to insure or require that the franchisee take advantage of that training.

actions undertaken by a managing member and 75% shareholder of the corporation—Barrett—may be imputed to the corporation, and therefore that Barrett's criminal actions may be imputed to Barr Donut. *United States v. 141st St. Corp.,* 911 F.2d 870 (2d Cir.1990) (upholding lower court's decision that any knowledge or consent of criminal activity by the president of a corporation imputes criminal liability to the corporation). By laundering money obtained from the sale of illegal drugs, Barrett committed at least two violations of 18 U.S.C. Section 1956, the federal money laundering statute, and therefore violated paragraph 5.1.7 of the franchise agreement. Dunkin' asserts that Detective Hammock's testimony with respect to Barrett's drug smuggling and money laundering activities both prior to and during his ownership of the franchise creates no genuine issue of material fact that Barrett violated paragraph 5.1.7 of the franchise agreement. Second, Dunkin' asserts that Barrett's invocation of his Fifth Amendment privilege when questioned with respect to whether drug money was used to purchase the shop as well as with respect to whether he had purchased the shop to launder drug proceeds, permits the fact finder to draw an adverse inference against him.

■ As a general matter, the Barr defendants claim that Dunkin' relies largely on information obtained by Detective Hammock as part of the investigation against Barrett, and that such information is inadmissible in this proceeding because it was offered in violation of the proffer agreement. Barrett in particular argues that the validity of Hammock's cooperation is still the subject of ongoing litigation in the United States Court of Appeals for the Ninth Circuit. Specifically, over the objection of the Barr defendants, Dunkin' obtained a subpoena from the United States District Court in Arizona to depose Hammock on the topics covered during the proffer sessions. The Barr defendants have appealed the decision of the district court, and, in Barrett's view, the issue remains pending in the Ninth Circuit. Further, the Barr defendants urge that Barrett's invocation of his Fifth Amendment privilege does not warrant an adverse inference against him because the "invocation specifically qualified his rights by referring to the terms of his proffer agreements and the sealing order of Judge Frank R. Zapata." In other words, because Barrett was under a court order and a proffer agreement not to reveal the information discussed in his plea and proffer sessions, his invocation of his Fifth Amendment privilege was not susceptible to an adverse inference with respect to the substance of the questions posed to him. Barrett points out that, as of today's date, neither the United States Attorney's Office nor the plaintiff has moved to unseal the district court proceedings or to release defendant from his proffer agreement promises. Finally, with respect to count V specifically, the Barr defendants maintain that Barrett's allegedly criminal actions did not even fall within the scope of the franchise agreement, as paragraph 5.1.7 refers to health and safety regulations rather than to "general criminality."

I find that no genuine issue of material fact exists with respect to whether the Barr defendants breached paragraph 5.1.7 of the franchise agreement. As a preliminary matter, defendants' argument that Detective Hammock's deposition testimony is inadmissible because it violates Barrett's proffer agreement is without merit. In his opinion dealing with the question of whether Dunkin' could subpoena Hammock in the first instance, Judge Browning of the United States District Court for the District of Arizona addressed whether Hammock's testimony would violate (1) the Privacy Act; or (2) Barrett's proffer agreement. With respect to the proffer

agreement, Judge Browning asserted that "because the topic of the request for discovery is sufficiently dissimilar from the subject of the proffer agreement, the Court cannot say that any harm that may befall Defendant from the release of this information was likely one that Defendant sought to protect against when he made his proffer agreement with the Government." (Pl.'s reply memorandum Ex. A). In addition, with respect to Judge Zapata's decision to seal the agreement, Judge Browning stated that "the parties have offered no evidence that Judge Zapata's decision to seal was anything more than a routine decision made when there has been evidence offered such as this, and certainly there is no evidence that Judge Zapata intended to prevent the disclosure of information related to the franchise. The sealing of a court file is generally intended to protect against potentially harmful disclosure to the general public— it is not intended to prevent the world from ever seeing the documents again." (*Id.*). In addition, as Dunkin' points out, Barrett's proffer agreement nowhere provides that Barrett's statements may *not* be used against him in any future civil—as opposed to criminal—proceeding. (*Id.* Ex. 2B). In any event, criminal testimony, even when subject to an immunity agreement, may be used in civil proceedings. *See, e.g., State v. Goodell,* 1986 WL 2986, at *1 (D.Colo. Mar.4, 1986) (stating that "[a]t the outset, it should be noted that the federal government's grant of immunity to [the defendant] in the prior criminal suit does not preclude the use of [the defendant's] testimony to establish his liability in this subsequent civil suit"). Accordingly, I will rely on Detective Hammock's certification in ruling on Dunkin's motion and Zak's cross-motion.

■ Pursuant to paragraph 5.1.7 of the franchise agreement, Barr agreed to comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, the Board of Fire Underwriters and other similar organizations and all governmental agencies, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop. (*Id.* Ex. C, ¶ 5.1.7).

The Barr defendants' principal contention is that this paragraph refers only to certain kinds of laws relating to the operation of the franchise—in particular, laws pertaining to "health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop"—and is "not directed at general criminality." (Barrett memorandum at 9). This argument is entirely without merit. First, as a matter of law, courts in this Circuit have found that this kind of contractual "including, but not limited to" language may denote a non-exclusive list of applicable provisions. *See, e.g., Shugrue v. Continental Airlines,* 977 F.Supp. 280, 285–86 (S.D.N.Y.1997) (plain language of "including without limitation" indicates list in agreement is not exclusive). Second, and more specifically, criminal behavior may fall within the ambit of a general "obey all laws" clause such as the one at issue here. *See, e.g., Dunkin' Donuts Incorp. v. Gav–Stra Donuts, Inc.,* 139 F.Supp.2d 147 (D.Mass.2001) (holding that tax fraud conspiracy violated a franchise agreement's "obey all laws" clause). To be sure, on its face this provision explicitly states that the franchisee will "comply promptly with all applicable laws ... of public authorities including, but not limited to, ... all governmental agencies, however designated, which address health, safety, sanitation, environmental *or other issues affecting operations of the Dunkin' Donuts Shop.*" (Pl.'s Rule 56.1 Statement, Ex. C, empha-

sis added). Surely the Barr defendants cannot truly contest that drug smuggling and money laundering do *not* fall within larger categories that constitute "other issues affecting operations of the Dunkin' Donuts Shop." In fact, one could reason that "general criminal activity" is specifically covered by paragraph 5.1.7 insofar as laws of governmental agencies that address "safety" fall within its scope.

The only question, then, is whether Dunkin' has demonstrated that no genuine issue of material fact exists with respect to whether Barrett engaged in criminal behavior in the first instance. In his certification, Detective Hammock revealed that Barrett used proceeds from smuggling marijuana to open the Melville Shop (Pl.'s Rule 56.1 Statement, Ex. 6 ¶ 3) and that Zak was laundering money for Barrett right up until the time when he purchased the shop. (*Id.*). According to Hammock, Barrett admitted that he was approached by Zak in 1995, and Zak proposed that he launder money for Barrett at a rate of 15%. Barrett agreed, and, in 1996, Zak began issuing checks to Barrett from the account of "Oshrie Zak, Esquire." Dunkin' has in fact provided copies of those checks in its motion for partial summary judgment. (*Id.* Ex. 11). In addition, Detective Hammock also stated that in August 1998—*after* Barrett had purchased the franchise—Barrett made arrangements for 200 pounds of marijuana to be transported from Arizona to New York, where Barrett distributed his portion. Further, in or about October or November 1998, again after Barrett had purchased the shop, Barrett made arrangements for shipments of 50–60 pounds of marijuana to be shipped from Arizona to New York. (*Id.* Ex. 6 ¶ 3). Moreover, contrary to defendants' contention otherwise, Barrett's invocation of his Fifth Amendment privilege when questioned with respect to whether he laundered money from drug activity permits the Court to draw an adverse inference against him. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). The evidence adduced on Dunkin's motion for summary judgment with respect to count V overwhelmingly shows that Barrett did engage in criminal activity both before and after opening the Melville Shop. Since the franchise agreement must be terminated on this ground alone, one cannot help but wonder whether this extended and extensive litigation wasn't overkill in the extreme. In any event, Dunkin's motion for summary judgment with respect to count V will be granted.

**3. Dunkin's Motion for a Declaratory Judgment Against defendants Glassman and SRS**

■ In count XV of its third amended complaint, Dunkin' claims that it is entitled to a declaratory judgment against the Glassman and SRS defendants on the ground that the waiver letter entered into between Glassman, SRS, Barrett, and Zak on May 27, 1998 is clear on its face that the transfer agreement's conditional "option to re-enter" extinguishes upon termination of the Barr franchise agreement. Specifically, the waiver letter states that

> [t]he conditional option to re-enter agreement and all rights granted to transferor thereunder shall extinguish and be of no further force and effect upon the expiration or termination of the transferee's franchise agreement. (*Id.* ¶ 53 Ex. 17).

The language of the waiver letter is clear and unambiguous on its face that the transfer agreement's "conditional option to re-enter" extinguishes upon the termination of the transferee's franchise agreement. Because the Barr franchise agree-

ment has been terminated for reasons detailed *supra,* SRS' and Glassman's (the "transferors'") conditional option to re-enter has been extinguished and a declaratory judgment is granted in Dunkin's favor with respect to this count.

### III.   CONCLUSION

For the foregoing reasons, Dunkin's motion for partial summary judgment against Barr on count I of it complaint is granted, and its motion for summary judgment against the Barr defendants with respect to count V of its third amended complaint is also granted and the franchise agreement terminated.   In addition, Dunkin's motion for a declaratory judgment against the Glassman and SRS defendants is granted.   Attorney's fees, if any, will be awarded in accordance with submissions provided as noted *infra.*

**IT IS SO ORDERED.**